## Rank, Appellant, *v.* Metropolitan Edison Company.

Argued January 10, 1952. Before DREW, C. J., STERN, STEARNE, BELL, CHIDSEY and MUSMANNO, JJ.

*Eugene D. Siegrist,* with him *Miller & Miller* and *Siegrist, Koller & Siegrist,* for appellant.

*L. E. Meyer,* with him *Meyer, Brubaker & Whitman,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY, April 1, 1952:

Lizzie M. Rank, as administratrix of the estate of her deceased husband, brought this action against Metropolitan Edison Company to recover damages under the Wrongful Death and Survival Acts, alleging that her husband's death was caused by the defendant's negligence. This appeal is from the lower court's decree denying plaintiff's motion to take off the compulsory nonsuit entered at the trial.

By virtue of a right-of-way agreement defendant in 1931 erected and thereafter maintained a line for the transmission of electricity across one of the fields of a farm in Lebanon County owned at the time of the occurrence with which we are concerned by Alfred E. Twigg and wife. The right-of-way agreement, entered into by the Twigg's predecessors in title, contained a reservation which permitted cultivation of the ground between the company's poles and underneath its wires "provided that such use shall not interfere with or obstruct the rights" of the company therein granted. The transmission line ran diagonally across the field. From a pole at the corner of the field to the next pole in the middle of the field, a distance of 275 feet, there was a guy wire for anchoring and support fastened to the corner pole between the cross-arms at the top and extending to the other pole to which it was fastened at a point about 8 feet above the ground. The sag in this guy wire between the poles brought it at the lowest point within 5 or 6 feet of the ground. The transmission line carried high tension wires of 13,600 volts

and service or distribution wires of 4,600 volts. The former were attached to the upper of two cross-arms at the corner pole and the latter to the lower cross-arm. There was a transformer attached to the pole below the cross-arms mentioned. The guy wire was fastened to this pole at a point between the two cross-arms which were 2 feet apart. There was an insulator on the guy wire about 1 foot from where it was fastened to this corner pole. Both the high tension and distribution wires were uninsulated. There was testimony that this was the general practice in rural transmission lines.

The decedent was a farmer who did farming for others. On August 7, 1947, between 4 and 5 o'clock in the afternoon, the date and hour of the occurrence, he was removing hay from the field where defendant's transmission line was located. He had farmed the property for a number of years, both for the Twiggs and their predecessor owner. The decedent was operating a Papec harvester and tractor. This equipment would cut hay, but the hay was already cut and lying on the ground, so that it was being used for another of its functions, to gather the hay and blow it through a pipe into a truck at the rear. The decedent's nephew, Gerald Gettle, then 11 years of age, was in the truck. When the portion of the field where defendant's transmission line was located was reached by decedent, since the outfit he was operating could not be driven underneath the guy wire, he drove to the pole in the middle of the field, obtained a wrench from the tractor, stood on the running board of the truck and removed the bolt which ran through the pole, after detaching the nut on the other side. The wire fell down somewhat away from the pole. The decedent then took the end of the wire and with the assistance of the boy who grasped it about 15 feet away from him, dragged the wire a distance of 140 feet to the edge of the field. At this point

both the decedent and the boy received an electrical shock and both were thrown to the ground. The decedent's hands and clothing were burned and he died a short time thereafter. The boy was unconscious for a short time and his hands were burned, but he survived and testified as an eye witness on behalf of the plaintiff. The only reasonable inference to be drawn was that the guy wire when thus dragged or pulled 140 feet had come into contact with wires of the service line running from the second cross-arm.

Plaintiff charged that the defendant was negligent in the construction and maintenance of its line, particularly in having the insulator on the guy wire only a foot away from the pole, thus permitting the guy wire beyond the insulator to come into contact with the live wires. At the trial plaintiff called a professor of electrical engineering and consulting engineer and offered to prove faulty construction on the part of the defendant, particularly with respect to the location of the insulator on the guy wire. An objection to the qualification of this witness was sustained on the ground that he had had no experience with rural transmission lines of the voltage of electricity here involved.

There was no evidence or suggestion that the guy wire which of itself was sterile of electricity was affixed to the two poles in a manner that would produce danger to those in lawful proximity or liable to come accidentally or otherwise in contact with it. It had remained, as originally affixed to the two poles, without incident. Only if tampered with and removed from its location could it become charged with electricity. It is not necessary to decide whether such possible removal fell within a foreseeable orbit of danger, for, assuming negligence on the part of the defendant, the decedent's action was a proximate cause of the accident making him clearly guilty of contributory negligence. Since

we must so hold, it is unnecessary to pass upon the ruling of the court below with respect to the proffered testimony of plaintiff's expert.

We are in accord with the views expressed in the opinion of the court below: ". . . the defendant had maintained the same power transmission lines through the field in which the decedent was killed, since 1931. The decedent had been farming in this field for a period of five years and upwards. The guy wire was attached in the same manner during this period of time,[1] and the decedent was familiar therewith. The guy wire was not charged with electricity while it remained in its original position prior to being detached and moved by the decedent for a distance of approximately one hundred and forty feet in the direction at right angles to the transmission line. It was apparent when the decedent and young Gettle moved the guy wire, as aforesaid, that it came in contact with the transmission line of defendant and thereby became charged with electricity which killed the decedent. The decedent was the sole actor in the operation which led to his death. . . . However, assuming that the defendant was chargeable with negligence, we are of the opinion that the facts and circumstances testified to in this case so clearly showed that the decedent was chargeable with contributory negligence that reasonable persons would not fail to agree with that conclusion. We are of the opinion that the decedent not only heedlessly brought himself into a position that the guy wire came in contact with the distribution circuit, but that the manner in which the decedent removed the guy wire and

---

[1] Plaintiff's counsel in his brief apparently assumes that the guy wire had sagged after its erection. This is not borne out by the testimony nor charged in plaintiff's complaint. It may be said that a sag of 2 or 3 feet in the original erection of this half-inch wire would be expected in a span of 275 feet.

moved it in a direction in which it was certain to come in contact with the distribution circuit, was foolhardy. Any reasonable person would know that when two wires that were not insulated came into contact, one of which was charged with electricity, that the other was bound to become charged with it."

In *Haertel v. Pennsylvania Light & Power Company*, 219 Pa. 640, 69 A. 282, this Court held that "While electric companies are bound to use the highest degree of care practicable to avoid injury to everyone who may be in lawful proximity to their wires, yet the ordinary person is held to know that danger attends contact with electric wires, and it is his duty to avoid them so far as he may. If one heedlessly brings himself in contact with such a wire, and is injured in consequence, his imprudence must be regarded as a contributing cause, and will prevent a recovery." This statement of the law had been repeatedly approved by this Court.

The case of *Everett v. Citizens' Gas & Electric Company*, 228 Pa. 241, 77 A. 460, is analogous to the instant case. There the plaintiff's wife was killed by an electric current that passed from the defendant's feed wire to a guy wire and thence to a wire clothes line in her yard on which she was hanging clothes. Her property fronted on a borough street and extended back to an alley. There was an electric light pole on the street near the division line between her property and that of an adjoining owner, and a pole in the alley close to the fence in the rear of her lot. A guy wire extended from the top of the electric light pole in the street along the division line to the pole in the alley where it was fastened 7 feet from the ground. The plaintiff some years before the accident fastened one end of a wire clothes line to this pole and the other end of the wire to a grape arbor. The guy wire was afterwards re-

moved and a new one put in its place. At the time of the accident the clothes line was wrapped around the guy wire and around the pole. Entry of judgment *non obstante veredicto* by the court below was affirmed in a *per curiam* opinion which stated: "The only danger in the situation was created by the deceased, or by someone acting for her, in making an unauthorized and manifestly unsafe use of the pole and guy wire." In unsuccessfully endeavoring to distinguish this case, plaintiff's learned counsel suggests that the affixation of the clothes line to the pole and guy wire in the *Everett* case was an act of trespass. Certainly plaintiff's decedent in the present case was even more of a trespasser when he detached the guy wire and dragged it 140 feet. The right to cultivate under the defendant's wires was conditioned upon there being no interference with defendant's transmission line and its adjunctive facilities.

We have carefully considered the cases principally relied upon by the plaintiff and they are all distinguishable. In *Fitzgerald v. Edison Electric Illuminating Company*, which twice reached this Court on appeal, 200 Pa. 540, 50 A. 161; 207 Pa. 118, 56 A. 350, a defectively insulated wire was involved. The accident happened in an urban area. The defendant company had extended its wire, apparently without permission, across the corner of a house and so close that by rubbing against it the insulating material was partly worn off. Plaintiff's decedent was engaged in painting the house and was lawfully upon the roof in the exercise of his business. In order to get at the cornice to paint, he propped the wire with a board which slipped loose. He received an electric shock and fell to the ground. Just how he came into contact with the wire did not appear. This Court said: ". . . but though he [the decedent] was bound to know in general the dan-

gerous nature of such wires, and to use proportionate care in interfering with them, he was also entitled to presume, from the general custom, that they were properly insulated, unless the defect in their covering was visible to such examination as he ought to have made." Thus in this case the wires were insulated and the question was whether the decedent should have discovered the defect in the insulation. He was in close proximity to the wire and could see that it was an insulated wire, whereas the decedent in the instant case either knew that the transmission wires were uninsulated or heedlessly failed to concern himself as to the fact.

In *Sebring v. Bell Telephone Co.*, 275 Pa. 131, 118 A. 729, for months the defendant had left a dead broken wire hanging from its telephone line and three boys on a rainy dark evening either pushed or pulled the wire into the street so that it came into contact with a trolley wire. They received electric shock which was fatal to two of them. In discussing the question of contributory negligence on the part of the boys, Mr. Justice WALLING, speaking for the Court, said: "They came suddenly upon this wire in their path at night; they could not see where it was attached or know that its movement would bring it in contact with a highly charged wire; they were not bound to anticipate defendant had left it in a dangerous condition."

In *Brillhart v. Edison Light & Power Company*, 368 Pa. 307, 82 A. 2d 44, the plaintiff's decedent was electrocuted when a metal pipe which he and a fellow worker were installing in a well pump came in contact with a high tension uninsulated wire of the defendant company carrying 4,600 volts of electricity. Because of a short elbow at the end of the pipe, it was necessary to push the elbow end of the pipe in through one of the windows of the pump house and up and out a

trap-door opening in the roof until the lower end of the pipe was in position over the well. The end of the pipe extending above the roof came into contact with the lower of two high tension wires which were negligently maintained too close to the roof of the pump house. There was testimony that these wires because of shrubbery and trees were not visible where the men were working and there was "not a shred of evidence" that the decedent either saw or should have seen the high voltage wires. Furthermore the decedent was engaged in the only method of carrying out the installation of the pump and he did not, like the decedent in the instant case, voluntarily interfere with or trespass upon the defendant's facilities.

The material facts in this case are undisputed and fully explain the happening. The presumption that a person who has lost his life exercised due care is not applicable where the plaintiff's own testimony clearly establishes the decedent's negligence: *Weldon, Admrx., v. Pittsburgh Railways Company*, 352 Pa. 103, 41 A. 2d 856; *Simmonds v. Penn Fruit Company*, 354 Pa. 154, 47 A. 2d 231. The instinct of self-preservation upon which the presumption is founded, was conspicuously absent here. The decedent's unfortunate death was caused by his own unjustifiable conduct.

Decree affirmed.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

In my opinion the learned trial Judge gravely erred in rejecting the testimony of Professor A. R. Miller, electrical engineering expert, on the negligent or non-negligent construction of the poles and transmission wires, from which issued the electrical impetus which struck Ira K. Rank down in death, like a thunderbolt from the sky.

There could be no question about Professor Miller's qualifications. He was a graduate in electrical engineering of both the University of Illinois and the Ohio University. He had followed electrical engineering for 29 years and was at the time of the trial engaged in teaching that very subject and power construction at the Lehigh University. He was employed as consulting engineer for the Electrical Power Equipment Company and for the Bethlehem Steel Company, and had had five years' experience in the construction of light and power lines and while he had not constructed a 13,000 volt line he had constructed and maintained a 6,000 volt line and had completed the "lines of transmission" and supplied electrical equipment for a sub station with the capacity of 13,000 volts.

When the plaintiff offered Professor Miller as a witness the Court commented: "No, we think that is purely a matter for the jury," and then sustained the objection of defendant's counsel which was worded: "We object to this witness testifying as to what was negligent construction of these lines because it is a matter solely for the jury to determine whether it is negligence or not. The facts are clearly stated here and it is for the jury to determine whether that was negligence or not; it doesn't require expert testimony."

As I read the record in this case it was utterly impossible for the jury conscientiously to decide the issue of negligence without some light to open up the darkness which envelops for the layman the whole subject of electricity. How many persons on the average jury can explain the force imprisoned in a slender wire which propels over the surface of the earth tons of metal carrying scores of persons in a vehicle called a trolley car? And how many persons on the average jury would of their own knowledge know about the

placing of insulators, guy wires, transformers, breakers, high tension wires (all terms used in this trial), to determine whether the defendant was guilty of negligence or not?

A guy wire is simply a wire for anchoring or supporting a pole in position, and, so far as electrification is concerned, is as innocuous as a garden hose. The plaintiff's husband, Ira K. Rank, unfastened the guy wire involved in this case from the pole to which it was attached—and it apparently had spent most of its supporting strength since it sagged—and carried it over 100 feet without incident or injury. Suddenly at the 140 foot mark, the garden hose became a live serpent that fastened its lethal coil about his person with such deadly tightness that it had to be severed from him with an ax. Somewhere in the trajectory of this hauling, some portion of the harmless guy wire running out of his hands apparently came into contact with an instrumentality charged with high voltage electricity, and the mighty current plunged through the hitherto slack and strengthless guy wire to kill him. Although witnesses described the poles to which the guy wire was attached and there was testimony with regard to various cross wires, insulators and breakers, there was no evidence from which the jury could affix or absolve responsibility for the untimely death of 39 year-old Ira K. Rank.

In the case of *Laudenslager v. Pennsylvania Power & Light Co.*, 312 Pa. 169, 167 A. 778, this Court approved of an expert witness testifying, (in a case involving death as the result of contact with electric wires,) that the break in wires was due to improper splicing and that the distance between the poles supporting them was too great, causing the wires to break of their own weight. How would the jury in that case have known whether the wires were properly spliced,

without the benefit of expert testimony on the subject?

In American Jurisprudence, Volume 20, p. 647, we find this discussion on expert or skilled witnesses: "Frequently, the jury, or the court trying a case without a jury, is confronted with issues the proper understanding of which requires scientific or specialized knowledge or experience and which cannot be determined intelligently merely from the deductions made and inferences drawn on the basis of ordinary knowledge, common sense, and practical experience gained in the ordinary affairs of life. . . In such cases, witnesses possessing requisite training, skill, or knowledge, denominated 'experts,' may testify, not only to the facts but to their opinions respecting the facts, so far as necessary to enlighten the jury and to enable it to come to a right verdict."

The plaintiff here, as in every case of tort, was charged with establishing negligence on the part of the defendant. How was he to prove that negligence, except with evidence showing faulty construction or maintenance on the part of the defendant company; and who could specify what that negligence was except one trained in that kind of work?

In the case of *Kaufman v. Pittsburgh Rwys. Co.,* 363 Pa. 96, 69 A. 2d 90, where the accident also involved electricity, the Supreme Court approved of the calling of an expert witness to testify to technical facts not so difficult of ascertainment as those in the case at bar. "The plaintiff charged the defendant with negligence in its failure to maintain the line in a safe condition and in failing to inspect it at reasonable periods. In support of these allegations, the plaintiff called as a witness a concededly well-qualified expert in mechanical and electrical engineering of many years active experience who testified that the span of the transmission line's suspension in front of the plain-

tiff's place of business was unusual and not 'ordinary good practice'; that this condition produced a heavy sag in the line of approximately five feet at the place in question which made it a comparatively easy matter for the line to be blown or swayed by the wind into any nearby structure. The expert further testified that the absence of insulating wrapping laid the rubber insulation of the line open to deterioration and to ready abrasion from swinging into and rubbing against the edges of the sign; and that the defective condition of the insulating wrapping of the line was not of recent development but due to the wear and tear from exposure to the elements for 'at least twenty-five years.' "

Had Professor Miller been allowed to testify in this case, it is conceivable that his testimony would have demonstrated that Ira K. Rank, in the circumstances of the case, was not guilty of contributory negligence. The rejection of this expert's testimony crippled the plaintiff's case and from that point it moved like one with a broken back. This vital disablement of the plaintiff's proof, in effect, denied Lizzie M. Rank, widow of the dead farmer, of her day in court.

The learned trial Judge stated in his opinion refusing to take off the non-suit which he imposed, that the question of negligence was moot since the proof of contributory negligence was conclusive. But there can be no adjudication of contributory negligence unless there is an ascertainment of the alleged negligence. Contributory negligence is not legal negligence per se, but it is a negligence which contributes to the happening of the accident. Section 473 of Restatement, Torts, reads: "If the defendant's negligence has made the plaintiff's exercise of a right or privilege impossible unless he knowingly exposes himself to a risk of bodily harm, the plaintiff is not guilty of contributory negligence in so doing unless the risk is unreasonable."

Under this rule, accepted as law in Pennsylvania, there can be no determination of contributory negligence until and unless the act of alleged negligence is explained, understood and crystalized. And in order to bring about that crystalization, there must be the clearest understanding of the facts which make up the accident which gave rise to the litigation.

If the defendant's maintenance of the guy wire across the farm was a negligent one and the negligence made the decedent's operation of the farm at that point impossible, this would absolve the decedent from any accusation of contributory negligence.

What was the accident in this case? When a person darts out before an oncoming automobile, it is obvious what the contributory negligence is, but in dealing with so intangible a substance as electricity, skilled evidence is required to discover the forces which brought about the mishap. Where did Ira K. Rank's contributory negligence begin? He carried the wire 139 feet without incident. At the 140 foot mark something occurred. The learned trial Judge assumed in his opinion that the cause of the electrocution was the meeting of the guy wire and the "distribution circuit", but there is no evidence in the record that *that* is what sent the fatal current through the guy wire.

If this case ends without a new trial, it will terminate on a mystery as deep as electricity itself as to just how the harmless guy wire killed Mr. Rank.

The agreement, which authorized the defendant company to construct transmission lines over the ground being used by the decedent, reserved to the landowners "the right to cultivate the ground between said poles and beneath said wires, provided that such use shall not interfere with or obstruct the rights herein granted."

The uncontradicted evidence in the case established that the guy lines over the grantor's land sagged to five feet above the ground so that it impeded the decedent in the cultivation of the ground. Such an impediment is a serious deprivation of enjoyment of property because no one has the right to deny a farmer the right to draw sustenance from his own ground.

The lower Court declared in its opinion that "it was possible to harvest the hay without the use of the Papec machine and tractor and without removing the guy wire." There is no doubt the decedent could have worked without the modern agricultural machinery now employed practically everywhere except in the most primitive areas on the face of the earth. He could have ploughed the land with a hand plow, sowed from an apron, and harvested the wheat with a sickle. But there was nothing in the contract signed by the defendant which empowered it to compel the farmer to use the back-breaking manual methods of prehistoric Egypt so as not to come into contact with the wire negligently or non-negligently adjusted and maintained by the defendant company.

When the contract was signed, tractors, Papec harvesting machines, trucks and general motor machinery were as much an incident of American farm life as running water, and the defendant had no more right to demand that the landowner do away with tractors than to compel him to go back to the old oaken bucket for drawing water. And it is obvious that if a wire is placed across a man's land so as to immobolize tractors, the operation of that part of the farm served by the tractor must practically cease.

Furthermore, the wire sagged to a point that the decedent with his feet on the ground could not stand under it without harrassment. He stood 5 feet 6 inches

in height and the wire drooped to 5 feet above the ground.

The lower Court recognized that the sagging wire constituted a barrier to the proper operation of the farm when it said that the high tension lines and the transmissions lines, "plus the fact *that the guy wire had sagged within a distance of five feet from the ground,* would probably have been sufficient evidence to submit to the jury the question of Defendant's negligence." (emphasis supplied.)

But the Court went on to found its decision on the decedent's alleged contributory negligence. It cannot be said that the temporary removal of the guy wire in any way substantially interfered with the defendant's rights under the contract with the landowner. It caused the company no damage and in no way impeded the operation of the transmission lines.

Conceded that the decedent would have used better judgment by applying to the defendant company's operation engineers for a removal of the guy wire rather than attempting to remove it, it does not follow as a matter of law that he was guilty of contributory negligence in temporarily removing a barrier which prevented him from using the land to its best agricultural advantages.

In the case of *Fitzgerald v. Edison Electric Illuminating Co.,* 200 Pa. 540, 544, 50 A. 161, the plaintiff's husband propped up some electric wires which passed over his roof. Later, while painting under the wooden prop, the wires fell on him and he was killed. The lower Court entered a non-suit on the ground of contributory negligence, but this Court removed the non-suit and said: "The nonsuit, however, seems to have been entered on the ground of contributory negligence of the decedent. He was lawfully upon the roof in the

exercise of his business. It is said that there was no evidence that it was necessary for him to go on the roof to do the painting. No such evidence was required. His convenience was reason enough. It was convenient for him to get at the cornice in that way and he had a right to do so. He found the wires in his way, and proceeded to prop them up so that he could work under them. Whether the means he took were such as a prudent man should have taken is not so clear that it can be determined by the court. If the weight of the wire when it fell on him had been such as to knock him into the street, that would have been so clearly his own negligence that the court could have said so as matter of law. But though he was bound to know in general the dangerous nature of such wires, and to use proportionate care in interfering with them, he was also entitled to presume, from the general custom, that they were properly insulated, unless the defect in their covering was visible to such examination as he ought to have made. All these considerations entered into the question of his negligence, and made it one for the jury."

Ira K. Rank was a simple tiller of the soil without education or training in the field of electrotechnics. And it was up to a jury, also not skilled in electrotechnics to say whether by temporarily removing a wire which apparently served little if any supporting purpose, since it sagged so pronouncedly, he acted as a reasonably prudent person or not.

The courts make a distinction between what is heedlessly done and what is ignorantly done. In the case of *Bowser v. Citizens L., H. & Power Co.*, 267 Pa. 483, 110 A. 372, the Supreme Court sustained a verdict based upon facts which indicated that the decedent had picked up an electric wire, not recklessly, but unaware of its potentialities as it came into contact with the wet earth.

Did Mr. Rank know that by moving the guy wire he was flirting with grave danger? Or would any reasonably prudent person have assumed, as Rank did, that the circumstances excluded peril? This was a question of fact for the jury, not a question of law for the Court.

So, also was the question of defendant's negligence a matter of determination by the jury. When persons or corporations string wires carrying death over inhabited lands, a high degree of care is required of them to safeguard the people under those wires from harm resulting from faulty construction or maintenance. Whether the defendant corporation in this instance lived up to that standard of care was for the jury.

Comment c under Section 302 of Restatement, Torts says: "Probability of intervening action. If the actor's conduct has created a situation, which is harmless if left to itself but is capable of being made dangerous to others by some subsequent action of a human being or animal or the subsequent operation of a natural force, the actor's negligence depends upon whether he as a reasonable man should recognize such action or operation as probable. The actor as a reasonable man is required to know the habits and propensities of human beings and animals and the normal operation of natural forces in the locality in which he has intentionally created such a situation or in which he knows or should realize that his conduct is likely to create such a situation."

The defendant corporation, through its officers, employes and agents, could certainly foresee that a sagging wire over agricultural land would constitute an impediment to an agriculturist and that in coping with the wire the agriculturist could possibly come to harm. The defendant knew the dangerous potentialities of this intricate and complicated wire system. The decedent

did not. He had worked for several years in these fields and had seen and undoubtedly touched and handled the guy wires many times. There was nothing to put him on notice that they could drag him to an untimely death.

I would remove the non-suit and order a new trial.