Densler, Appellant, *v.* Metropolitan Edison Company.

586

Argued March 20, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*James C. Hogan,* with him *Robert A. Freedberg, Herbert G. Litvin,* and *Hogan and Scott,* for appellant.

*John J. DiGiacomo,* with him *Teel, Stettz, Shimer & DiGiacomo,* for appellee.

OPINION BY HOFFMAN, J., September 22, 1975:

Appellant contends that the lower court erred in excluding certain evidence which he offered concerning the appellee's alleged negligence, and in subsequently granting appellee's motion for a compulsory nonsuit.

In July, 1968, the appellant, Harry Densler, was employed as a technician for Clear-Pic Cablevision Co., a division of National Trans-Video, Inc., a cable television company. Clear-Pic, by virtue of a licensing agreement, was permitted to attach its cable to poles owned and operated by the appellee, Metropolitan Edison Co., ("Met Ed") an electric power company. At approximately 8:30 on the morning of July 12, 1968, the appellant and a co-worker, Robert Transue, received an order from their supervisor, Stephen Parkansky, to change a line extender, or small amplifier, located on a Clear-Pic line attached to a Met Ed utility pole on Frost Hollow Road

in Forks Township. Transue went up a ladder and changed the line extender. The appellant then threw a coaxial cable up to Transue, which Transue attached to the line extender. Appellant, still on the ground, then took a meter reading. Transue then came down from the pole, and he and the appellant started back to their shop. On the way there, they met Parkansky, who told them that they had installed the wrong line extender. Parkansky told Transue and the appellant to return and replace the line extender. When they returned to the pole, Transue put the ladder up against the pole and began to ascend it, carrying a new line extender. The appellant got the meter and coaxial cable out of the truck; he remembered nothing more about the accident. Parkansky testified that Transue told him, immediately after the accident, that appellant "threw a line up to him, he was going to read the meter from the truck to save time, and he threw a line up to me and it wrapped around the power line." Parkansky arrived at the scene within a few minutes after the accident and found the appellant lying near the bottom of the pole, "his glasses . . . half off his face, . . . foaming at the mouth and . . . moaning. He was unconscious." In his left hand, he was holding a piece of coaxial cable approximately six feet long.

The forty-foot Metropolitan Edison pole around which this accident occurred carried three high-voltage power lines, in addition to the television cable. Although the power lines were designed to carry 34,500 volts, phase-to-phase voltage, they were uninsulated. According to answers to interrogatories by F. J. Smith, Vice President of Met Ed, which were read to the jury, the three high-tension wires were attached to the pole at 24.55, 28.75 and 32.85 feet above ground level; the television cable was located 7.43 feet below the lowest Met Ed wire. Nevertheless, Parkansky, appellant's supervisor, testified that "the lower power line, in my estimation, was about four feet above the television cable." Appellant

testified that the nearest electrical line "looked, approximately, around four feet" above the television cable.

The coaxial cable which apparently came into contact with the high-tension wire was insulated. However, Martin Kaplan, appellant's expert witness, testified that "[i]n any voltage above three hundred volts, the insulation would break down and would, for all practical purposes, would not be there." It appears that this cable, though insulated sufficiently to withstand the voltages commonly used in cable television transmission, would not withstand accidental contact with a high-tension wire.

Appellant brought suit against the appellee in the Court of Common Pleas of Northampton County. The case went to trial before a jury on January 28, 1974. On January 30, 1974, a compulsory nonsuit was entered against the appellant. On September 18, 1974, the court en banc denied the appellant's motion to remove the compulsory nonsuit. On October 2, 1974, judgment was entered in favor of the appellee. This appeal followed.

Our courts have long recognized that the standard of care imposed upon a supplier of electrical power, particularly when that power is supplied at high voltage, is among the highest recognized in the law of negligence. "A supplier of electrical current 'is bound not only to know the extent of the danger, but to use the very highest degree of care practicable to avoid injury to everyone who may be lawfully in proximity to its wires and liable to come accidentally or otherwise in contact with them.' " *Brillhart v. Edison Light & Power Co.,* 368 Pa. 307, 312, 82 A. 2d 44 (1951), citing *Fitzgerald v. Edison Electric Illuminating Co.,* 200 Pa. 540, 543, 50 A. 161 (1901) and other authority. "That a transmission line is a dangerous instrumentality is recognized everywhere. No matter where located it is a source of grave peril and the law requires that the possessor of such an instrumentality exercise a high degree of care[.]" *Yoffee v. Pa. Power & Light Co.,* 385 Pa. 520, 536, 123

A. 2d 636 (1956). "Enigmatic as is the basic element of electricity, no one with the slightest mentality is ignorant of its vast potentialities for destruction. The degree of care required to protect people from this devastating element is no less than that required to prevent poisonous reptiles from breaking loose from their restraining enclosures. As the proprietor of ferocious beasts may not, by pleading excessive cost for confining them, escape liability for the loss of life occasioned by his savage wards, so also the owner of high-voltage electric machinery may not avoid responsibility for the devastation caused through his failure to adequately guard such uninhibited devices." *Cooper v. Heintz Mfg. Co.*, 385 Pa. 296, 304, 122 A. 2d 699 (1956).

The class of persons "lawfully in proximity" to the wires includes not only members of the general public who walk along the street or sidewalk, but maintenance employees who work on or around the utility poles. In *Erie County Electric Co. v. Mutual Telephone Co.*, 265 Pa. 181, 184, 108 A. 524 (1919), wires of both the electric company and the telephone company were attached to a telephone pole. Our Supreme Court noted that "[i]t was the duty of that [electric] company to have its wire there properly insulated, for it is presumed to have known that not only its employees, but those of the telephone company, in the lawful performance of their duties, might climb up the pole[.]"

At trial, the appellant's principal theory of liability was that the appellee was bound, under its very high duty of care, either to insulate the high-tension wires, or to take steps to isolate them sufficiently from any persons except those specifically qualified to work around such high-tension wires. The appellant' called Martin Kaplan, an Associate Professor of Electrical Engineering at Drexel University, as an expert witness to substantiate this theory, and provide criteria by which the jury might determine whether this duty has been met. In

furtherance of this theory, the expert witness was allowed to introduce into evidence various provisions and definitions from the National Electrical Safety Code.[1] Kaplan testified that §214A of the Code requires that "[t]o promote safety to the general public *and to employees not authorized to approach conductors and other current-carrying parts of electric supply lines,* such parts shall be arranged to provide adequate clearance from the ground or other space generally accessible. . . . or shall be provided with guards so as to isolate them effectively from accidental contact by such persons." (Emphasis supplied.) He further testified that "[q]ualified," under the Code "means familiar with the construction and operation of the apparatus and the hazards involved." He also testified that, under the Code, for the purpose of determining the minimum vertical distance, or "clearance" within which he could approach a wire, any person who was not "qualified" would be treated as a member of the general public.

Nevertheless, after allowing the expert witness to testify as to these general principles, the lower court refused to allow him to answer any questions concerning what a person would have to do or be in order to become "qualified" under the National Electrical Safety Code. Toward the end of Professor Kaplan's testimony, the appellant proposed a number of hypothetical questions to the witness, concerning possible situations involving "unqualified" employees (or "members of the general public") working on a pole carrying high-tension wires as well as a cable television line. At the end of this series, the appellant asked "[i]f the man on the pole, 7.43 feet away from the line, was a member of the general

---

1. The National Electrical Safety Code is an industry-wide code prepared under the auspices of the Bureau of Standards. The Code does not have the force of law, but is voluntarily accepted as a minimum standard by the electrical industry.

public, would it then be safe for the member of the general public standing on the ground to be dealing with that man?" The expert answered "No, sir." The lower court, although it had allowed a series of similar hypotheticals, and indeed cited one as support for the nonsuit, ordered the question stricken from the record.

Appellant contends that the lower court erred by unduly restricting the expert witness's testimony. The appellee contends that these questions were properly excluded as being based on facts not in the record, or asking for an opinion on the ultimate issue in the case.

While certain questions were properly excluded as not being based on facts of record, for example, those hypothetical questions which assumed that the appellant was actually standing within 7.43 feet of the power lines, rather than on the ground, it is clear that the questions cited above did not involve this frailty. The trial court had earlier stated that whether the appellant was "qualified" or "unqualified" for high-tension wire work was a jury question; presumably the same would hold for his co-worker, Transue. Futhermore, the evidence did indicate that appellant assisted Transue, who was standing within 7.43 feet of the high-tension wire.

Although conclusional statements by witnesses on matters of safety or duty of care which lay jurors are competent to judge are inadmissible, *Maholland v. Bird,* 230 Pa. Superior Ct. 431, 326 A. 2d 528 (1974), *Taylor v. Fardink,* 231 Pa. Superior Ct. 259, 331 A. 2d 797 (1974), an expert's opinion that safety measures are inadequate or contrary to accepted safety provisions may properly be admitted into evidence where the subject matter is not within the common knowledge and observation of laymen. *McDonough v. U.S. Steel Corp.,* 228 Pa. Superior Ct. 268, 272, 324 A. 2d 542 (1974). Indeed, it appears to be standard practice in electrical accident cases for an expert witness to first introduce the standards of the National Electrical Safety Code,

and then indicate that the requisite or customary standard of care is greater than that appearing on the face of the Code. Thus, in *Groh v. Philadelphia Electric Co.*, 441 Pa. 345, 349, 271 A. 2d 265 (1970), the expert witness testified that although "under the literal wording of the National Electric Safety Code a conductor [involved in that case could have been placed] within three feet of the wall, . . . 'within the intent of the National Safety Code, it was too close in the absence of any guards or protection.'" And in *Burke v. Duquesne Light Co.*, 231 Pa. Superior Ct. 412, 417, 332 A. 2d 544 (1974), "[t]he Burkes produced two expert witnesses who testified as to the distance of the electric wires from the house which Mr. Burke was repairing at the time of his accident. These experts stated that although the distance conformed to the regulations found in the National Safety Code, it was insufficient, in their opinion, to constitute good engineering practice."

Nor does it appear that such evidence is inadmissible as going to a purely legal question of duty. Rather, the more specific standard posed by the expert witness or the Code is used to flesh out the very broad standard imposed by decisional law upon every supplier of electric current to everyone who might lawfully in any way come in contact with the wires. See *Groh v. Philadelphia Electric Co.*, supra.

Although the question of the admissibility of expert testimony is often said to be within the discretion of the lower court, appellate courts have reversed this discretion where excluded expert testimony has been essential to the case of a nonsuited plaintiff. *Weisman v. Sauder Chevrolet Co.*, 402 Pa. 272, 167 A. 2d 308 (1961) ; *Ritson v. Don Allen Chevrolet*, 233 Pa. Superior Ct. 112, 336 A.2d 359 (1975). Here, the lower court too narrowly restricted the testimony of appellant's expert witness; this evidentiary ruling must be reversed.

It appears that the lower court also erred in refusing to allow testimony concerning the appellee's safety pro-

gram for its own employees. The lower court believed that this evidence could only be material if the appellee were found to be under a specific duty to train the appellant. "The actor's own record of past conduct, which is commonly called 'habit' rather than custom, is no evidence of any standard of reasonable care, but when he has departed from it, it may be used against him as indicating his knowledge of the risk and the precautions necessary to meet it. The same, in general, is true of rules made by the defendant to govern the conduct of his employees. . . ." Prosser, Torts, §33 at 171 (3d ed. 1964). Here, the prohibitions in the appellee's safety manual, particularly that against throwing objects, indicate that testimony concerning safety training would be relevant to determine whether the appellee should have foreseen the appellant's conduct in throwing the coaxial cable.

The appellant also introduced evidence in an attempt to prove that the vertical clearance between the television cable and the lowest power line was less than the minimum of six feet which, his expert witness testified, was required by the National Electrical Safety Code. Thus the appellant and Parkansky, who were both present at the accident site at approximately the time of the accident, testified that the cable was approximately four feet below the lowest power line. The appellee, on the other hand, contends that the appellant is bound by the figure of 7.43 feet given by the appellee's vice president in answer to one of the appellant's interrogatories and read to the jury at the beginning of the trial.

The appellee contends that the figure of 7.43 feet given by its officer amounted to an incontrovertible physical fact, and that the appellant therefore could not rely on evidence contrary to that figure. "The rule as to incontrovertible physical facts discrediting the testimony of one side in an action of trespass is applicable only in clear cases." *Keck v. Phila. Rapid Transit Co.*, 314 Pa.

389, 394, 171 A. 478, 480 (1934). Indeed, our Court has noted that "[t]rial courts should apply the incontrovertible physical facts rule with caution. We have examined 17 cases in which the Appellate Courts of this Commonwealth have dealt with the rule during the past ten years, and in every one the rule has been held inapplicable to the facts." *Ropele v. Stewart*, 185 Pa. Superior Ct. 522, 529, 137 A. 2d 895 (1958). The Supreme Court has stated that "no fact based on oral testimony is incontrovertible until it receives the imprimatur of a jury's acceptance. . . ." *Vereb v. Markowitz*, 379 Pa. 344, 348, 108 A. 2d 774 (1954).[2] The instant case does not seem to be an appropriate one for the application of this rule. It is basically a case of oath against oath, the officer of the appellee against the appellant and his supervisor. Although the more exact figure proffered by the appellee may under some circumstances merit greater credibility, it is still a question which must ultimately be resolved by the jury.[3]

Appellant contends that the lower court erred in entering a compulsory nonsuit against him. "It is horn-

---

2. Although the answers to the interrogatories in this case were written, the questions and answers were read to the jury in an attempt to simulate the oral testimony of the appellee's vice president, and to save him the expense of a personal appearance. It does not appear that such testimony deserves any greater credibility than actual oral testimony, particularly when there is no opportunity for cross-examination.

3. The appellee also contends that even if it failed to provide adequate separation between the wires, such a duty was owed only to a person actually working on the wires, and not to a person standing on the ground. Nevertheless, negligence liability in electrical cases has frequently been found to extend to plaintiffs injured by bringing a conductor into simultaneous contact with themselves and electrical wires. See *Groh v. Philadelphia Electric Co.*, supra. Whether it is foreseeable that the plaintiff would bring the conductor into contact with the defendant's wires presents a factual question similar to whether such contact amounts to contributory negligence on the part of the plaintiff, which is discussed below.

book law that a judgment of nonsuit can be entered only in clear cases, and before it may be entered the plaintiff must be given the benefit of all evidence favorable to [him] and all reasonable inferences of fact arising therefrom; and all conflicts in the evidence must be resolved in [his] favor." *Tolbert v. Gillette,* 438 Pa. 63, 65, 260 A. 2d 463 (1970). "A court may rule, as a matter of law, on questions of negligence only when the evidence is clear and unmistakable." *Hargrove v. Frommeyer & Co.,* 229 Pa. Superior Ct. 298, 305, 323 A. 2d 300 (1974).

It appears that in the instant case evidence was introduced from which a jury might infer that the appellee owed a duty to the appellant, that the appellee breached that duty, and that the appellant suffered injury as a proximate result thereof. See *Noon v. Knavel,* 234 Pa. Superior Ct. 198, 339 A.2d 545 (1975). First, as we noted initially, the appellee owed the highest duty of care to anyone who might lawfully come into contact with the wires, including employees of a joint user, such as the appellant. See *Erie County Electric Co. v. Mutual Telephone Co.,* supra. Appellant was the employee of a licensee of the appellee, and therefore could lawfully work in proximity to the appellee's wires. The appellant's expert witness offered evidence from which the jury could infer that the appellee owed a duty to isolate the high-tension wires from anyone who was not specifically qualified to work thereon, or at least provide specific warnings of the dangers associated with these particular wires. In the light of appellant's testimony that he had received no adequate safety training, it was at best a jury question as to whether he was "qualified" to work in proximity to the high voltage wires, or assist another person of similar qualifications so working.

Appellee contends that appellant must be found guilty of contributory negligence on the theory that if a person

heedlessly[4] brings himself into contact with an electric wire, his imprudence will amount to contributory negligence and bar a recovery or alternatively, that such an act is not within the foreseeable scope of the hazard created by the appellee. See *Rank v. Metropolitan Edison Co.*, 370 Pa. 107, 87 A. 2d 198 (1952). Appellee relies on *Parker v. Pennsylvania Power Co.*, 301 Pa. 375, 378, 152 A. 538 (1930), where the Court indicated that the act of the decedent in pulling his radio aerial, "an uninsulated twisted copper wire," over a point on the defendant's power line where the insulation was frayed, was contributory negligence as a matter of law. Similarly, in *Geroski v. Allegheny County Light Co.*, 247 Pa. 304, 93 A. 338 (1915), the plaintiff decided to use copper-plated wire instead of a rope to raise the flag on a flagpole projecting out into a street. The Court held that the contact of this copper wire with the defendant's power line, some twenty-nine feet in the air, could not reasonably have been anticipated by the defendant.

Nevertheless, a parallel line of cases holds that a person is not ordinarily charged with knowledge of the degree of danger associated with a particular electrical wire. In *Stimmel v. Kerr*, 394 Pa. 609, 611, 148 A. 2d 232 (1959), the lower court had charged the jury that " 'If you believe . . . [decedents] could have seen the wires or poles if they had looked, then your verdict must be for the [defendants].' " The Supreme Court upheld the grant of a new trial, noting that "[t]he import of the court's charge was tantamount to a directed verdict and clearly indicated that the mere presence of the wires or the poles was sufficient warning to place the decedents on notice of the danger and completely relieve the landowner of liability." The Court, quoting *Stark v. Lehigh*

---

4. It appears that an action which is "heedless" is more than ordinarily negligent; "[i]t is almost as strong [a word] as 'reckless' . . ." Black's Law Dictionary, 853 (4th ed. 1951).

*Foundries, Inc.*, 388 Pa. 1, 8, 130 A. 2d 123 (1957), noted that " '[t]he presence of the power lines in and of itself did not indicate obvious danger. Plaintiff was not bound to know the degree of danger involved. "Wires charged with an electrical current may be harmless, or they may be in the highest degree dangerous. The difference in this respect is not apparent to ordinary observation, and the public, therefore, while presumed to know that danger may be present, are not bound to know its degree in any particular case." ' "

In the instant case, the court was not dealing with an interloper, but with a person who was expected to perform work on and about the utility poles. The coaxial cable which the appellant threw was insulated to such an extent as to make it impervious to the current in the cable system with which the appellant habitually dealt. The jury had heard appellant's testimony that he did not know the difference between insulated and uninsulated wires, but that the three power lines appeared to be insulated. He also stated that he did not know and had not been informed that Met Ed used uninsulated wires. The jury had the testimony of Parkansky, the appellant's supervisor, that installers, the class of employees to which appellant originally belonged, were in the habit of throwing cable while performing their jobs.

It is fundamental that contributory negligence as a matter of law may be declared only in a case that is free from doubt. *Tonik v. Apex Garages, Inc.*, 442 Pa. 373, 377, 275 A.2d 296 (1971). Under the circumstances of this case, although the appellant may have been contributorily negligent, and although his conduct might have been unforeseeable to the appellee, these issues would at least present jury questions.

The judgment entered pursuant to the order of non-suit is reversed, and the appellant is granted a new trial.

600

DISSENTING OPINION BY PRICE, J.:

Because I believe that the appellant's cause is precluded by the fact that he was contributorily negligent as a matter of law, I must briefly dissent.

In *Parker v. Pennsylvania Power Co.*, 301 Pa. 375, 152 A. 538 (1930), a case very similar to this one, the plaintiff, in the course of erecting a home radio aerial, attached one end of the aerial wire to a tree. He attached a pair of pliers to the other end and then tossed the pliers over the defendant's overhead power lines. This action brought the aerial wire into contact with the power lines, and when plaintiff seized the pliers, he was electrocuted.

In affirming a judgment for the defendant, the court approved language used earlier in *Haertel v. Pennsylvania Light & Power Co.*, 219 Pa. 640, 643, 69 A. 282 (1908): " 'While electric companies are bound to use the highest degree of care practicable to avoid injury to everyone who may be in lawful proximity to their wires, yet the ordinary person is held to know that danger attends contact with electric wires, and it is his duty to avoid them so far as he may. If one heedlessly brings himself in contact with such [an electric] wire and is injured in consequence, his imprudence must be regarded as a contributing cause and will prevent a recovery.' " 301 Pa. at 378-79, 152 A. at 539. *See also Rank v. Metropolitan Edison Co.*, 370 Pa. 107, 87 A.2d 198 (1952).

The majority, however, chooses to follow a line of cases, culminating in *Groh v. Philadelphia Electric Co.*, 441 Pa. 345, 271 A.2d 265 (1970), which holds that "the mere presence of power lines does not indicate an obvious danger and . . . the public is not charged with knowledge of the amount of current in (and thus the risk associated with) a particular line. (citations omitted). Therefore, the mere fact that decedent saw or should have seen the lines does not make him contributorily negligent as a matter of law." 441 Pa. at 350, 271 A.2d at 268.

I must admit that I can discern no important distinction between *Haertel* and its progeny, and the line of cases relied upon by the majority. However, if a person knows of the existence of a wire charged with an unknown amount of electricity, and knows that large quantities of electricity constitute an extreme danger to life, I cannot see how he can be held to have exercised due care if he negligently or intentionally comes into contact with that wire.

In this case, although appellant did not purposely come into contact with appellee's wire, he did not exercise due care to avoid it. From approximately twenty feet below his co-worker, Transue, appellant threw a wire up to Transue while holding one end. From the ground, the power line looked like it was only four feet above the wire Transue was working on. Appellant must have realized that there was a substantial risk that the wire thrown by him would come into contact with the power line. Thus, appellant evidenced an unreasonable disregard for his own safety, and was contributorily negligent as a matter of law. *See Aljoe v. Penn Central Light & Power Co.,* 281 Pa. 368, 126 A. 759 (1924).

The fact that appellant did not know that this line carried a potentially lethal charge will not mitigate his conduct. He knew that it carried an unknown quanity of electricity, and in my opinion, that knowledge alone was enough to place appellant under a duty to use reasonable care to avoid coming into contact with it.

I would affirm the judgment of the lower court.

JACOBS, J., joins in this dissenting opinion.