Hogg, Admr., Appellant, *v.* Bessemer & Lake Erie Railroad Company.

Argued March 25, 1953. Before STERN, C. J., STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Lee C. McCandless*, for appellant.

*Archie C. Voorhies*, with him *John L. Wilson* and *Whiteman, Voorhies, Dilley & Keck*, for appellee.

OPINION BY MR. JUSTICE CHIDSEY, May 25, 1953:

The plaintiff, H. R. Hogg, as adminstrator of the

estate of his son, Harold W. Hogg, deceased, brought this action of trespass against Bessemer & Lake Erie Railroad Company under the Survival and Wrongful Death Statutes to recover damages arising out of fatal injuries sustained by plaintiff's decedent when the motorcycle he was operating at night ran into defendant's moving freight train at a rural railroad crossing. The jury rendered verdicts in favor of the plaintiff and made specific findings (1) that the railroad crossing described in this case was peculiar, unusual, hazardous and very dangerous at the time of the accident and (2) that the defendant railroad was guilty of wanton misconduct. The defendant moved for judgment *non obstante veredicto*. The court below granted defendant's motion. From the judgment for the defendant accordingly entered, plaintiff appeals.

On August 23, 1949, about 9:30 p.m., a dark but clear night, Harold W. Hogg, the decedent, then 18 years of age, was driving his motorcycle in an easterly direction on an improved black top highway known as State Highway Route 10068, leading from Slippery Rock Borough toward the City of Butler and passing through a small village called Branchton where four tracks of the defendant railroad crossed the road at approximately right angles. The tracks ran north and south, the highway east and west. The train with which decedent collided was going north on the second track from the west. The decedent's motorcycle ran into the middle of the train which consisted of 101 hopper (also called gondola) cars which were about 11 feet in height. The train had completely occupied the crossing before the motorcycle reached it. The decedent received injuries resulting in his death two days later. His motorcycle was so badly damaged it was sold as junk for $30. The decedent was very familiar with the railroad crossing, having lived within 800 feet of it all his

life and having driven over the crossing frequently on his motorcycle, both in the daytime and at night.

The railroad tracks were straight for about 500 feet south and one-half mile north of the crossing which was 47½ feet wide from east to west and 28 feet wide from north to south. It consisted of planks fastened down with lag screws. Some of the lag screws were either missing or loose and this permitted the planks to work up and down as a vehicle crossed over them, but none of the planks was missing. Ash roads from the north and south connected with the improved highway just west of and near the railroad tracks, as a result of which some ashes were scattered on the highway and upon the railroad crossing. A standard railroad cross-buck warning sign 8 to 10 feet high stood 9 feet west of the tracks and 3 to 5 feet south of the highway, having reflector buttons on it and the statement "4 Tracks". 200 feet or more west of the crossing on the south side of the highway there was a Pennsylvania Department of Highways railroad warning sign. The crossing was in a rural area and there were no buildings west of the tracks either north or south of the highway to obstruct the view of one approaching the crossing from the west. For more than 350 feet west of the railroad crossing the highway was straight. There was a 4% rise in the highway from a point 275 feet west of the railroad crossing to a point 80 feet west thereof, then a 1% rise from that point to a point about 20 feet from the crossing, and the remaining 20 feet of the highway was level to the crossing. Plaintiff adduced testimony that because of the upgrade approach of the highway to the crossing, the lights of a motor vehicle approaching from the west on a dark night would not reveal railroad cars on the crossing until the motor vehicle was close to it. In his Statement of Question Involved which was concretely related to the accident, appellant stated that ". . . the lights of

the [decedent's] motor cycle did not disclose the track was occupied until the motor cycle was within twenty-five feet of the moving train . . .". Plaintiff adduced testimony that in prior years two motor vehicles collided with the sides of trains moving over this crossing at night. In both instances, however, the operators, who testified at the present trial, admitted they had not stopped before entering upon the crossing.

There were no flashing lights or illuminating lights at the crossing. On different occasions, over a period of years, recommendations were made by residents near the crossing and by staff officers of the company that the crossing should be lighted, either by an overhead light or by flashing lights. The railroad management considered these recommendations but concluded that such additional precaution was not necessary.

There was only one eye witness to the accident. James G. Grossman, called by the plaintiff, testified that before the accident he was traveling eastward on the highway; that he saw defendant's train coming from the south when it was a considerable distance away; that because the woman companion[1] with him was "scared", he pulled his car off the road to the left, turned it around and parked in an area north of the highway and west of the railroad tracks. After thus parking, he said he observed the light of the approaching motorcycle when it was about 425 feet west of the railroad crossing and that the engine of the train had then passed the crossing, proceeding northward on the second track. He said, ". . . the next thing that happened, I heard the squeal of the brakes. And the planks rattling.". Upon looking up he saw the motorcycle run into the middle of the train, half of which he said had passed to the

---

[1] She subsequently became Grossman's wife, was subpoenaed but, according to him, was too ill to testify. She was related to the plaintiff and the deceased.

north of the crossing; that when he first saw the motor-
cycle it was crossing the first (southbound) track; that
he saw the handle bars of the motorcycle turn toward
the north and that the motorcycle collided sidewise with
the train; that ". . . when he [the decedent] put on the
brakes it slid into the train."; that shortly after the
accident he saw a single tire mark about a foot in length
on the plank crossing where the motorcycle slid between
the first and second tracks; that he did not see any tire
mark on the first track or west of it on the approach to
the crossing.[2]

He also testified that the planks on the crossing were
loose, some bolts missing; that some ashes from the two
ash roads were on the approach to the crossing and "a
few" on the crossing itself; that the planks had been
loose for two or three years, causing them to rattle
when a vehicle passed over them; that ashes from the
ash roads had been scattered on the highway over a
long period. When asked by plaintiff's counsel as to the
atmospheric conditions, he said that it was a "Pretty
dark night, and kind of a mist coming from the creek,
made kind of a dull night, like moisture in the air.".
The creek was about 350 feet west of the crossing. He
did not testify, nor did anyone else, that the "mist"
interfered to any extent with vision. He testified that
he was parked 63 feet north of the highway and 30 feet
west of the railroad tracks. From this point he ap-
parently had no difficulty in seeing the train and the
motorcycle, and exactly how the collision occurred at
the railroad crossing. E. S. Gould, called as a witness
by plaintiff, was driving his automobile westwardly to-

---

[2] Employes of the defendant testified that they examined the
crossing early the next morning and found marks described as gouges
west of the northbound track at the apparent point of collision, which
extended as a single skid mark for a distance of about 60 feet west
of the track.

ward the crossing at the time of the accident, and after the train passed by, discovered what had happened and stayed with the injured young man while the witness Grossman went for his parents. Gould testified that it was a clear night and the road was dry; that he did not see the engine on the train but the headlights of his car disclosed the gondola cars on the crossing and he stopped his automobile 25 or 30 feet therefrom.

While a decedent is presumed to have used due care, this presumption cannot obtain where the plaintiff's own testimony establishes the decedent's negligence: *Rank v. Metropolitan Edison Company*, 370 Pa. 107, 87 A. 2d 198; *Wickline v. Pennsylvania Railroad Company*, 347 Pa. 136, 31 A. 2d 535; *Weldon, Admrx. v. Pittsburgh Railways Company*, 352 Pa. 103, 41 A. 2d 856. After considering all of the evidence in this case most favorably to the plaintiff as we are obliged to do, it clearly establishes negligence on the part of the decedent. He manifestly entered upon and proceeded across the railroad crossing after the lights of his motorcycle must have disclosed the railroad cars moving over it. At least from the time when the motorcycle reached the level stretch of 20 feet immediately west of the crossing, the decedent must have seen the tracks and the moving train as well, because the testimony was that the gondola cars, however much their color blended with the black top highway, were nevertheless visible. He was familiar with the crossing, having lived all of his life within 800 feet of it and having frequently passed over it, both in the daytime and at night. It was his duty to have his vehicle under such control as to be able to stop before entering the crossing. If in ascending the upgrade his lights did not disclose the road beyond the crest of the upgrade,[3] it was his duty to have his car under such

---

[3] While we are obliged to review the testimony in the light most favorable to the plaintiff, we are constrained to observe that the

control that he could stop or turn aside in case there was any obstacle beyond the crest not visible until his lights bore upon the level road ahead. Until he reached the crest there was no assured clear distance ahead. A driver must keep his vehicle under such control that he can always stop within the distance that he can see ahead.[4]

claim that the moving cars could not be seen by the lights of an approaching vehicle until it reached the beginning of the level stretch about 20 feet from the crossing because the preceding 80 feet was 1% upgrade (1 foot in 100 feet) is highly incredible if not mathematically and geometrically untenable. Experiments were made by a representative of the railroad company on a cloudy dark night who testified that the lights of an automobile meeting Vehicle Code requirements on low beam disclosed hopper cars of the same kind, height and color passing north over the crossing, for a distance of 140 feet from the west rail of the northbound track, and on high beam 230 feet therefrom; that the focus or center of the lights hit the cars (which were 11 feet in height) 4 feet above the rails.

[4] In *Rich v. Petersen Truck Lines, Inc.*, 357 Pa. 318, 53 A. 2d 725, this Court, at p. 321, adopted the following language of the lower court: "Section 1002 of the Vehicle Code of May 1, 1929, P. L. 905, and its amendments, 75 PS 501, provides, inter alia, that 'no person shall drive any vehicle upon a highway . . . at a speed greater than will permit him to bring the vehicle to a stop within the assured clear distance ahead.' The assured clear distance rule has been the law of Pennsylvania for many years. It was established as a common law principle and imbedded in our law by the above statute. Our courts have called it, 'the only safe rule': Simrell v. Eschenbach, 303 Pa. 156, 160; 'inflexible': Gaber v. Weinberg, 324 Pa. 385, 387; 'fixed and unchangeable': Stark v. Fullerton Trucking Co., 318 Pa. 541, 544; the statute has been applied in many cases as requiring judgment n.o.v. against operators of vehicles who have driven into obstructions on the highway, regardless of the negligence of the person who created the hazard. The rule has been applied to hold plaintiffs guilty of contributory negligence for having driven into obstacles on the highway when their range of vision was shortened by fog: Lauerman v. Strickler, 141 Pa. Superior Ct. 240; Cormican v. Menke, 306 Pa. 156; Shoffner v. Schmerin, 316 Pa. 323;

In addition to the decedent's duty to drive at a speed which would enable him to stop within the assured clear distance ahead, he was also faced with the duty to stop, look and listen before entering upon the crossing. The appellate courts of this State have repeatedly cited with approval (most recently in *Yolton v. Pennsylvania Railroad Company*, 368 Pa. 429, 84 A. 2d 501, and *Santore v. Reading Company*, 170 Pa. Superior Ct. 57, 84 A. 2d 375) the case of *Serfas v. Lehigh & New England Railroad Co.*, 270 Pa. 306, 113 A. 370, wherein Mr. Justice WALLING said at p. 308: ". . . it is the duty of a chauffeur traveling by night to have such a headlight as will enable him to see in advance the face of the highway and to discover grade crossings, or other obstacles in his path, in time for his own safety, and to keep such control of his car as will enable him to stop and avoid obstructions that fall within his vision. For example, it is the chauffeur's duty to keep his car under such control that whenever his headlight has brought a grade crossing into view he can stop before reaching it. Such crossing is not invisible by day nor, when an auto is equipped with proper lights, by night; in either case the chauffeur must discover its presence and stop before driving thereon. We have never held darkness an excuse for failure to perform this absolute duty, but the contrary: [citing cases] . . . Should we hold that the traveler need not stop to look and listen because of darkness, then we should logically extend the same immunity in case of a fog or snow storm or when the crossing was dimmed by dust or otherwise, even in the daytime. To

---

'by rain and fog': Mason v. Lavine, Inc., 302 Pa. 472; 'by fog, mist and ice': Janeway v. Lafferty Bros., 323 Pa. 324; 'by snow': Hutchinson v. Follmer Trucking Co., 333 Pa. 424; 'by a curve in the road': Gaber v. Weinberg, 324 Pa. 385; Simrell v. Eschenbach, 303 Pa. 156. In all of these cases it was held it is unavailing for the plaintiff to say that he had no reason to expect the obstruction in the highway.".

so hold would suspend the rule when needed most, and practically destroy it.".

In the present case it is clear that the decedent did not, or because of the speed at which he was traveling could not, stop before entering upon the crossing. There is no competent evidence that the ashes said to have been scattered upon the highway were the proximate or even a contributing cause of the accident. The same is true of the looseness of some of the planks upon the crossing. And it is to be observed that neither the looseness of the planks nor the "few" scattered ashes on the crossing would have been encountered until the train had passed, if the decedent had stopped as he was required to do before entering upon the crossing. It may be added with respect to the ashes on the highway that the railroad company was not responsible for the condition of the highway. See *Pittsburgh Southern Railway Company v. Taylor,* 104 Pa. 306.

But appellant contends that assuming that the decedent was guilty of contributory negligence, the defendant was guilty of wanton misconduct to which contributory negligence is not a defense. It is true that contributory negligence is not a bar to recovery in an action for injury caused by wanton misconduct: *Tanner v. Pennsylvania Truck Lines, Inc., et al.,* 363 Pa. 136, 69 A. 2d 366, but in such case there must be evidence that meets the legal definition of wanton misconduct. The latter differs from ordinary negligence not merely in degree but in kind. In *Kasanovich, Admrx. v. George et al., Trustees,* 348 Pa. 199, 34 A. 2d 523, Justice, now Chief Justice STERN, said at p. 203: ". . . It must be understood, of course, that wanton misconduct is something different from negligence however gross,—different not merely in degree but in kind, and evincing a different state of mind on the part of the tortfeasor. Negligence consists of inattention or inadvertence; whereas

wantonness exists where the danger to the plaintiff, though realized, is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong . . .".

Appellant contends that the railroad crossing here involved was extrahazardous; that the defendant realized the danger to the traveling public and its failure to provide flash or flood lights or other device at night to warn of the occupancy of the crossing by a moving train indicated a willingness to inflict injury and a conscious indifference to the perpetraton of a wrong. In *Wink et al. v. Western Maryland Railway Company*, 116 Pa. Superior Ct. 374, 176 A. 760, an automobile driven by the minor plaintiff at night collided with the 39th and 40th cars of a 96-car freight train which was passing over a highway crossing. In reversing the lower court which held that there was sufficient evidence of an extrahazardous situation to require the jury to determine the necessity for warnings, the Superior Court, after citing a number of cases, said at p. 379: ". . . These cases all hold that signals for trains approaching a highway crossing are solely for the benefit of drivers on the highway, so as to warn them of an *oncoming train,* and that they are not required if, as here, the train is actually on the crossing when the driver arrives. Then no other signals or warnings are necessary in the absence of a statute. There is none in this Commonwealth imposing such a duty on railroads.". (Emphasis supplied).

In *Everetts v. Pennsylvania Railroad Company*, 330 Pa. 321, 198 A. 796, this Court in a per curiam opinion adopted the following from the opinion of the court below: "'The undisputed evidence proves that this crossing was actually occupied by the train of the defendant company when the lights of the automobile first brought it into view. Although this crossing must be considered

dangerous in some respects, yet this evidence brings the case clearly within the ruling of Wink et al. v. Western Maryland R.R. Co., 116 Pa. Superior Ct. 374. There, under facts similar to those now under consideration, the Court held that there was no evidence to sustain a finding that the defendant was guilty of negligence,' ...".

In the recent case of *Yolton v. Pennsylvania Railroad Company*, 368 Pa. 429, supra, (a nighttime railroad crossing accident), this Court affirmed the opinion of the lower court wherein it was said at pps. 432, 433: "The plaintiff's contention that the defendant was guilty of negligence, placed upon him the burden of furnishing proof of unusual, peculiar, and extra hazardous conditions, as would take his case out of the rulings in the Wink and Everetts cases. The decisions in other states are of little assistance because of the different statutory requirements. In Pennsylvania we do not have laws compelling railroad companies to provide signals or warnings at grade crossings. Our courts have consistently held that warnings at railroad crossings are solely for the benefit of the users of the highway, that is, in order to warn the traveling public that trains are approaching the crossing. The plaintiff was not struck by an approaching train but ran into the side of a moving train, while the train was actually on and moving over the crossing before the plaintiff's automobile arrived upon the highway. No other warning is necessary to notify the highway traveler when the train is there in front of him. The plaintiff's argument that warning lights, warning signs, lights, bells, gates, or watchman should have been provided and that not to do so is negligent is not supported by any act of assembly nor by decisions of the courts of this state. Many of the cases cited in other jurisdictions are thus distinguished from the Wink case.". In that case testimony was given by residents of the neighborhood that the crossing was very dangerous and extrahazardous and that it was

difficult to see a train standing or moving slowly over the crossing. The jury also made a special finding as in the instant case that the railroad crossing was peculiar, unusual, extrahazardous and very dangerous at the time of the accident. As to this the court in entering judgment n.o.v. for the defendant said at pps. 434, 435 : "The plaintiff contends that the absence of a railroad crossing sign, lights, flagman, or signalman, coupled with the fact that the whistle was blown one thousand feet away from the crossing; that the only light on the train was on the locomotive which was back of the railroad coal cars; that there was a little fog; that the dark coal cars were being pushed slowly and noiselessly across the highway at a slow speed; that the view of the railroad tracks on the sides of the highway was obstructed; and that the highway had been so relocated some two years previously that the former roadway provided a place where automobiles park with blinding lights, all together created peculiar, unusual and extra hazardous conditions at the time of the accident and are sufficient circumstances to remove this case from the line of cases established by Wink vs. Railroad Company. Granting that evidence was produced to support these contentions and that the verdict of the jury established these facts, nevertheless, we are of the opinion that such facts are not sufficient to remove the case from the ruling established in the Wink case.".

In the *Yolton* case we held that the evidence did not support a finding of ordinary negligence. We are here asked to find the defendant guilty of *wanton misconduct*. Appellant claims that the occurrence of previous accidents at the crossing, of which the defendant had actual or imputed knowledge, required that remedial action be taken by it, but in each of the prior accidents the vehicle operator had failed to stop before entering the crossing. Failure to anticipate another's negligence is not negligence: *Szukics v. Ruch,* 367 Pa. 646, 81 A. 2d 903;

*Schofield, Admr. v. Druschel,* 359 Pa. 630, 59 A. 2d 919; *Handfinger et al. v. Barnwell Brothers, Inc.,* 325 Pa. 319, 189 A. 312. In all of these cases it was held that a party was not required to anticipate the clear negligence of another. No one is required to anticipate conduct on the part of another which clearly violates the standards of due care established by statutory and decisional law. And this principle is applicable to appellant's reliance upon defendant's failure to provide additional precautions after complaints from residents of the neighborhood and recommendations of some of the officers of its staff that flood or flash lights be installed. Neither these complaints nor the recommendations of the officers of the defendant establish the duty of care which was owed to the decedent. Such duty is established by the law. There is no statutory or decisional law in this State that required the railroad management to install additional or extraordinary warnings for the careless driver who fails to perform the duties imposed upon him. Under the circumstances here, the occupancy of the tracks by the moving train was sufficient warning to vehicle drivers who had their vehicles under such control as to be able to stop within the assured clear distance ahead. No warning other than the presence of the cars on the crossing was necessary for the driver exercising ordinary prudence. It is common knowledge that there are many railroad grade crossings in this State. The topography of each in connection with the approaches thereto varies. Generally speaking, some are more dangerous than others. The same is true of highways. We cannot find the crossing in question so extrahazardous or particularly dangerous that a person exercising ordinary prudence could not use it with safety unless extraordinary means were taken to protect his use thereof. Obviously if the defendant cannot be held guilty of ordinary negligence under the circumstances, it cannot be successfully charged with wanton misconduct. It may be added that

we agree with the lower court that even if the defendant were deemed guilty of wanton misconduct, the decedent was equally guilty thereof and could not recover. In *Elliott v. Philadelphia Transportation Company,* 356 Pa. 643, 53 A. 2d 81, we said at p. 648: "Plaintiff's reckless conduct bars recovery for the result of defendant's wanton misconduct for the same reason that contributory negligence constitutes a defense to an action based on mere negligence. Contributory negligence is a defence because it introduces into a case a new cause of plaintiff's injury making defendant's negligence no longer the legal cause. So in this case, defendant's wanton misconduct, as a legal cause of injury, was superseded by plaintiff's wanton or reckless misconduct which became the legal cause of his injury. . . .".

In the present case if the defendant were held guilty of wanton misconduct in not providing additional warnings at the crossing, certainly the decedent must be held to have been equally guilty of wanton misconduct when, familiar with the crossing and with knowledge that he was approaching it, he recklessly assumed that there would be no train on the crossing and forfeited his life.

Judgment affirmed.

---

Dissenting Opinion by Mr. Justice Musmanno:

The crucial test as to legal responsibility in this case is not, according to my opinion, what occurred on the night of August 23, 1949, but what happened during the previous fifteen years which prepared the fatal barricade against which 18-year old Harold Hogg rode to his untimely death.

The lower court stated in its opinion: "There were no flashing lights or illuminating lights at the crossing to disclose the presence of the railroad cars upon the

crossing itself. The Railroad Company, through its officials, had under consideration the construction of either one of such devices, *for a period of at least fifteen years.* Some of the staff officers had recommended such, but the management, after consideration, concluded that such additional precaution was not necessary. *Complaints had been made to the officials of the Railroad Company by persons living in the Village of Branchton, and several other accidents had happened,* of a similar character to the one now under consideration, although in each case the person involved had failed to stop before coming to the crossing." (Emphasis supplied.)

As far back as 1934 the unlighted state of the Branchton crossing was a matter of discussion among the officials of the defendant Bessemer & Lake Erie Railroad Company. In the early part of that year, T. C. Whiteman, General Counsel and Safety Director of the railroad wrote to F. R. Layng, Chief Engineer, enclosing a complaint from one Vern H. Kyle about the perilous intersection. On February 10, 1934, the Chief Engineer replied to the General Counsel and Safety Director: "I talked this over with Mr. Johnson this morning, and we both feel that the time will come when some protection should be arranged for, but we are both in doubt as to whether we should press it at this time. We will both think it over and I will take it up again with you later."

On May 10, 1934, E. J. McGeary, Assistant Superintendent of the railroad, wrote to W. M. Johnson, General Superintendent,—"Recently I was in Branchton and my attention was called to this crossing and a comparison made between it and the Annandale crossing. The latter crossing with flash light signals and practically no rail traffic and Branchton with numerous rail movements and highway traffic increasing, with no flash light signals."

On April 4, 1941, General Counsel Whiteman notified George Kamerer, Superintendent of Safety and Claims, that in view of the increasing volume of traffic at Branchton crossing, further consideration should be given to the matter of installing protective devices. He added that the operation would be an expensive one but that something would need to be done eventually, since, already, three accidents had occurred at the place in question.

On October 8, 1941, Chief Engineer Layng advised Whiteman that it might be difficult to install flashing lights but he knew of no other method for supplying the needed protection.

On October 9, 1941, Mr. Whiteman replied to Layng: "However difficult it is, if flashing lights could be made satisfactory, we feel we ought to do it."

On October 15, 1941, Mr. Pflasterer, Safety Engineer, informed Chief Engineer Layng that a preliminary study revealed that the crossing could be given the required protection by the introduction of flashing light signals.

On May 15, 1946, Mr. Snyder, Vice President and General Manager, wrote Chief Engineer Layng that people in the vicinity suggested the lighting up of the crossing at night by overhead street illumination. He specified: "If, after investigation, you find this installation desirable you may proceed to make the installation. If it is not desirable, please indicate why." On May 26, 1946, Lyang replied: "I do believe that if we go to the expense of flood lighting a crossing from both sides that it would be possible to provide sufficient illumination to do some good providing it be kept in mind that no illumination will be effective in fog." Layng added in his letter that they should go slow in making the installation because such an improvement might spur requests for similar installations at other points.

This, in brief, represents a cross section of the correspondence that transpired among the officials of the company about a condition that everyone recognized was fraught with extreme peril. But while the officials dictated discursive communications but did nothing to close the gap of danger, the plaintiff's son on his motorcycle of the future was plunging toward the catastrophe.

It will be recalled that in 1934 the Chief Engineer solemnly wrote that he and Mr. Johnson, the General Superintendent, felt that the time would come when "some protection would be arranged for," but they both doubted that they should press it "at this time." By 1946, 12 years later, they still had not pressed it, even though in the meantime three persons had come to grief at this ominous crossroad whose lurking dangers after dusk were hidden by the shrouds of night.

But the warnings had not yet ceased. One day in the summer of 1947, Vern H. Kyle, who lived only 115 feet from the fatal point and who had vainly protested as far back as 1934 about the perils of the Branchton crossing, telephoned the office of the railroad company and notified C. S. Leet, Assistant Manager, that lineman of the railroad company were working at the crossing that day: ". . . He said to me, 'Do we have the wiring in the depot?" I said, 'Yes'. He said, 'Where is it?' I said, 'Right across the crossing. I thought I would call you now, because the linemen are there, in order that without too much extra expense they could go ahead and do it, while they are there.' He said, 'Well, we will see about it'; but he said, 'You know we don't do things that quick.' "

Is two years "too quick" to remove a definitely established menace to life and limb? This conversation occurred in the summer of 1947; and in August, 1949, Harold Hogg was killed.

One witness, a James Colosimo, testified that the railroad company knew of this death trap at Branchton

even as far back as 1930. He testified that he had been injured there that year and that when a representative of the railroad called to talk to him about the accident he, Mr. Colosimo, urged that the railroad should install blinker lights: "that would be a real thing to put on the crossing." The railroad man demurred, saying that because of the "yard there, they would be working practically all the time." Colosimo said: "that wouldn't make any difference; as long as the lights were blinking, a motorist would naturally stop."

The jury found specifically that the Branchton crossing was "peculiar, unusual, extra-hazardous and very dangerous at the time of the accident." It also returned the finding that the defendant railroad company was "guilty of wanton misconduct." What was that wanton misconduct?

Coming events cast their shadows before them. It was just as inevitable that a tragedy would some day occur at Branchton as it is that night follows day. It was known that when a freight train filled the crossing at night, the black hulk of the cars would blend with the blackness of the highway and the nocturnal darkness; it was known that because of the rise of the highway to the crossing a vehicle's lamps would not light up the railroad until the vehicle was only some 20 feet away, when, because of the loose planks and the ashes on the highway, and the short distance for traction to take hold, a vehicle could not stop in time to avoid collision with any cars on the tracks. The safety directors, the safety engineers, the superintendents, the managerial staff of the railroad knew all this for fifteen years and did not lift a single bulb to illuminate and warn of the peril—simply because of the expense involved in supplying life-saving beacons and because they did not want to be rushed.

Wanton misconduct is not restricted to rapidly moving crises, e.g., a locomotive bearing down on a stalled

vehicle, the death-defying speed of an automobile on a dangerous curve, the hurling of a missile into a crowd of people. It does not need to strike with the celerity of a lightning flash. There can be wanton misconduct in the lethargic advance of a steam roller or in the methodic construction of a toppling wall. If the officials of the railroad knew of a defective railroad switch for fifteen years and did nothing to repair it, and a wreck occurred, the liability would arise not from the wreck but from the long continued, reckless, wanton and wilful disregard of the safety of the public.

"The duty of a railroad company not to do any wilful or wanton act is owing to the public generally, and is applicable in favor of anyone who happens to be in such position as to be the sufferer by the violation of the duty." (44 Am. Jur. 639, §422; Restatement, Torts, Sec. 500, p. 1295, comments (c) (d).)

When the jury found, on competent evidence, that the defendant company was guilty of wanton misconduct, it did not matter whether the plaintiff's decedent was or was not negligent. The fact that Harold Hogg was familiar with the crossing and had crossed over it in night and day, emphasized all the more the camouflaged appearance of the cars against the background of the night and the darkness of the black top roadway. One who is deceived by a masked danger cannot be convicted of contributory negligence. Travellers on the highway have the right to expect that drawbridges will be in place, that road excavations will be covered up and that railroad trains at crossings will be announced with one of various types of warning: a ringing bell, a flashing light, a swinging lantern, or a verbal admonition. The necessity of movement on our thoroughfares is just as important as the requirement of stoppage at indicated places. Furthermore, no witness testified that Harold Hogg did *not* stop before proceeding to cross the tracks. Thus, the plaintiff is entitled to have adjudged in his

favor the presumption that his son did stop, look and listen before entering on the railroad right of way. "When a person loses his life in a crossing accident there is a presumption that such person at the time of the accident was exercising due care." *Harris v. Reading,* 325 Pa. 296, 301, and cases there cited.

I would reverse the judgment of the lower court and reinstate the verdict of the jury.