ALDISERT, Circuit Judge,
Dissenting, and Concurring in Part.
Robert Zimmerman appeals from an order of the District Court, which granted Norfolk Southern Corporation’s motion for summary judgment. He had filed a civil complaint against Norfolk Southern Corporation (“Norfolk Southern”) in the District Court seeking damages for injuries sustained when he abruptly applied his motorcycle brakes at a railroad crossing and flew over the motorcycle’s handlebars, colliding with the side of a lead train engine proceeding over the crossing. He bottomed his personal injury claim against the railroad on (1) negligent failure to warn of an approaching train; (2) negligent failure to maintain a safe grade crossing area; and (3) negligence per se for violating various portions of 23 C.F.R. § 646.214(b) (adequate warning devices). I would affirm the judgment of the United States District Court for the Eastern District of Pennsylvania in its entirety.
Accordingly, I join that portion of the majority opinion that affirms the District Court’s determination that Zimmerman’s negligence per se claim, set forth above as the third issue, is preempted. I concur also in the majority’s approach to analyzing the Federal Railroad Safety Act (“FRSA”) preemption provision, codified at 49 U.S.C. § 20106. I am unable to agree with the majority’s reversal of the judgment on the two other issues presented to us. I therefore join Parts II and III C of *194 the majority opinion and dissent as to Parts III A and B.
I.
On the evening of June 12, 2008, Robert Zimmerman was operating his motorcycle southward on Diller Avenue in New Holland, Pennsylvania. He was wearing a full-face helmet with a visor and was familiar with the Diller Avenue railroad crossing because he had traveled down Diller Avenue and through the crossing “hundreds” of times before this incident. App. 00230. At approximately 10 p.m. that evening, two locomotives owned by Norfolk Southern — Engine 5657 and Engine 5656 — approached Diller Avenue. The engineer, Douglas Eppley, and the conductor, Stephen Romberger, were stationed in the head of the lead locomotive, Engine 5657. As the train entered the Diller Avenue crossing, Zimmerman, who had been traveling on his motorcycle approximately 30 to 35 miles per hour, abruptly applied his brakes and flew over the handlebars of his motorcycle. His body struck the side of the fuel tank portion of the lead engine. As a result of the collision, Zimmerman sustained extensive injuries and was airlifted to Lancaster General Hospital. He was subsequently transferred to a rehabilitation center, where he remained until his discharge in October 2008. He was left partially paralyzed.
Norfolk Southern operates the railroad crossing at Diller Avenue. The crossing protects southbound motorists with a crossbuck[1] on the side of the road in accordance with the Manual on Uniform Traffic Control Devices (“MUTCD”). This was a reflectorized crossbuck installed in 1987. Norfolk Southern also placed a black-and-yellow railroad-grade crossing sign approximately 150 feet north of the crossing. The company neither possesses nor controls any land or property in the vicinity of the Diller Avenue crossing other than its right-of-way.
Train conductor Romberger was positioned in the lead locomotive of a two-engine train. Positioned on the left side, he saw the motorcycle approaching when Zimmerman was approximately 50 feet from the crossing, and he realized that, “given Mr. Zimmerman’s speed[,] ... he was going to collide with us.” App. 00113. Zimmerman’s body collided with the fuel tank of the lead engine of the train approximately 30 feet from its front leading edge. The crossing is only 29 feet wide. The lead engine, therefore, was already through the crossing at the time Zimmerman collided with the train.
Zimmerman has no present recollection of the incident.[2] Two independent witnesses, Seth Huyard and Chad Kaufman, who were traveling in a truck approximately 60 feet behind Zimmerman on Diller Avenue, both “heard the train blowing its horn” as they approached the railroad crossing. App. 00520-00521. Huyard, the truck’s driver, stated that “as the train entered the intersection the motorcycle *195 rider appeared to apply his front brake causing him to go over the handlebars.” App. 00520. Kaufman, who was riding in the truck, saw “the train cross Diller Avenue. [He] then saw the motorcycle go into the side of the train.” App. 00521.
At the time of the collision, each locomotive was equipped with a digital recording device, known as an Event Data Recorder (“EDR”), which recorded information such as speed and horn activation. According to the EDR, the train was traveling at approximately 24 miles per hour at the time of the collision. The EDR also recorded that the train horn was activated beginning at a point of approximately one-quarter mile prior to the crossing and continued through the crossing, sounding for a total of 45 seconds.
On May 14, 2010, Zimmerman filed a four-count civil complaint against Norfolk Southern. On March 31, 2011, Norfolk Southern filed a motion for summary judgment, which the Court granted on August 17, 2011. Zimmerman timely appealed.
II.
In reviewing a district court’s grant of summary judgment, we exercise plenary review. See Gallo v. City of Phila., 161 F.3d 217, 221 (3d Cir.1998). We apply the same test as a district court applies, see Waldorf v. Shuta, 896 F.2d 723, 728 (3d Cir.1990), and will affirm if “there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,” Rule 56(a), Federal Rules of Civil Procedure. Facts must be viewed in the light most favorable to the non-moving party. See Monroe v. Beard, 536 F.3d 198, 206 (3d Cir.2008) (citation omitted).
III.
Zimmerman offers a number of reasons in support of his contention that the District Court erred in granting the motion for summary judgment. He asserts that his claims of negligence based on (1) inadequate signals and (2) excessive speed are not preempted. He contends also that the District Court erred in finding that no genuine issue of material fact exists as to his claims of negligence based on a common-law duty the railroad owed to (3) maintain a reasonably safe crossing and (4) provide adequate sight distance. Finally, he argues that the District Court erred in holding that certain documents, relevant to his excessive speed allegation, were privileged. For the reasons that follow, I would affirm the District Court’s judgment.
I would conclude that the District Court properly held that Zimmerman’s claims of negligence based on inadequate signals and excessive speed are preempted. With regard to Zimmerman’s common-law claims that Norfolk Southern failed to maintain a reasonably safe crossing and provide adequate sight distance, I would furthermore conclude that the District Court did not err in granting summary judgment in favor of Norfolk Southern, because Zimmerman failed to establish a prima fade claim of negligence and therefore no genuine issue of material fact exists. Finally, I would conclude that the Court correctly held that the documents related to his excessive speed allegation were privileged. Summary judgment was therefore appropriate and, as stated heretofore, I would affirm the entire District Court judgment.
IV.
For part of his negligence claims, Zimmerman alleges that Norfolk Southern failed to maintain a safe crossing at Diller Avenue. He alleges that the railroad negligently maintained the crossing devices, *196 and that the railroad failed to provide adequate sight distance, thereby preventing him from seeing the train that he struck until it was too late for him to avoid the collision. We have long recognized that railroads have a duty to provide a safe crossing, including adequate sight distances. See Strozyk v. Norfolk S. Corp., 358 F.3d 268, 277 (3d Cir.2004) (“A railroad must ‘exercise ordinary care at a crossing by adopting a reasonably safe and effective method, commensurate with the dangers of a particular crossing, of warning travelers of the approach of the train.’ ”) (quoting Nat’l Freight v. Se. Pa. Transp. Auth., 698 F.Supp. 74, 78 (E.D.Pa. 1988), aff'd, 872 F.2d 413 (3d Cir.1989)). Indeed, where “physical conditions visually blanket the speeding train until several short seconds before it sweeps ... into a crossing, a due responsibility for the safety of mankind dictates that something be done to alert the public ... above that of asking it to stop, look, and listen.” Johnson v. Penn. R.R. Co., 399 Pa. 436, 160 A.2d 694, 697 (1960).
At the same time, a motorist planning to drive through a crossing is required to respect the common law of Pennsylvania and the relevant statutes of that state. Thus, upon the sounding of the train’s horn, Zimmerman had to obey the following provisions of 75 Pa.C.S.A. § 3341(a):
Whenever any person driving a vehicle approaches a railroad grade crossing ... the driver of the vehicle shall stop within 50 feet but not less than 15 feet from the nearest rail of the railroad and shall not proceed until it can be done safely. The foregoing requirement shall apply upon the occurrence of ... the following circumstance! ]:
(3) A railroad train approaching within approximately 1,500 feet of the highway crossing emits a signal audible from that distance and the railroad train, by reason of its speed or nearness to the crossing, is a hazard.
Moreover, ruling case law of Pennsylvania teaches:
When a motorist approaches a railroad crossing that is occupied by a train, whether the train is traveling or stationary, the only duties involved are those of the motorist, namely:
(2) “to stop, look and listen before entering upon the crossing.”
Krentz v. Consol. Rail Corp., 589 Pa. 576, 910 A.2d 20, 28 (2006) (emphasis added) (citing Hogg v. Bessemer & Lake Erie R.R. Co., 373 Pa. 632, 96 A.2d 879, 884 (1953)).
Krentz was the Pennsylvania Supreme Court’s latest application of the venerable Occupied Crossing Rule, which “is as securely affixed to [Pennsylvania] jurisprudence as train tracks are to the land that they traverse.” Krentz, 910 A.2d at 27. Under that rule, “ ‘a railroad company cannot ordinarily be found negligent because it failed to station guards or light the car, or otherwise give warning of its presence in the highway,’ ” id. (quoting Cella v. Pa. R.R. Co., 364 Pa. 82, 70 A.2d 638, 640 (1950)), and this rule applies regardless of whether the train is moving or stationary, id. at 27 n. 9 (citing Cella, 70 A.2d at 639). The train’s presence in the crossing is “sufficient notice of its presence to warn any person using the highway with ordinary care.” Id. at 27.
The duty to stop, look and listen before entering a crossing, particularly a crossing that is occupied, is best expressed by the Pennsylvania Supreme Court’s statement in Serfas v. Lehigh and N.E. R. Co., 270 Pa. 306, 113 A. 370, 370-371 (1921): “The [plaintiff] openly violated the inflexible rule requiring the traveler to stop, look, *197 and listen before entering upon a railroad track.... ‘It is not a rule of evidence, but a rule of law, peremptory, absolute and unbending and the jury can never be permitted to ignore it, to evade it, or to pare it away by distinctions and exceptions.’ ” (quoting Pa. R.R. Co. v. Aiken, 130 Pa. 380, 18 A. 619, 620 (1889)).
The Occupied Crossing Rule has a long history in the Commonwealth of Pennsylvania, dating back to the Court’s 1938 opinion in Everetts v. Pa. R.R. Co., 330 Pa. 321, 198 A. 796 (1938) (per curiam). Although the rule arose during the era of contributory negligence, it has survived the 1978 adoption of the comparative negligence doctrine in Pennsylvania. See Krentz, 910 A.2d at 28 (stating that “ ‘the enactment of the Comparative Negligence Act does not change the well established rule that negligence cannot be found where the law does not impose a duty’ ”) (quoting Sprenkel v. Consol. Rail Corp., 446 Pa.Super. 377, 666 A.2d 1099, 1102 (1995)).
Zimmerman’s allegation that the crossing devices were negligently maintained is a failure to warn claim. He argues that Norfolk Southern breached a duty to maintain railroad warning devices because “the sign that warned of the approaching crossing was covered by tree branches, the pavement markings no longer existed, and the crossbucks had been allowed to fall into disrepair.” Brief of Appellant 43. Because he contends that the railroad failed to warn him of the danger at the crossing, we must determine whether any duty to warn was in fact owed to him by the railroad given the circumstances of the accident. See Krentz, 910 A.2d at 28.
Zimmerman, upon reaching the grade crossing, abruptly applied his brakes and flew over the handlebars of his motorcycle, striking a moving train. That moving train occupied the crossing at the time he struck it, triggering application of the Occupied Crossing Rule. As stated previously, a motorist approaching an occupied crossing has the duty to stop, look, and listen before entering the crossing; the railroad has no duty to warn of an occupied crossing. Id. As the Krentz Court notes in a footnote, railroads do in fact have a duty to warn of approaching trains. Id. at n. 10. Here, however, the lead engine already occupied the crossing at the time Zimmerman struck it. He struck the train at a point approximately 30 feet from the front of its lead engine, at a crossing that is only 29 feet wide. This is neither a matter of contributory nor comparative negligence; rather, Zimmerman cannot maintain his negligent maintenance of crossing devices claim because Norfolk Southern had no duty to warn of an occupied crossing.[3]
Zimmerman’s inadequate sight distance claim is also, at its core, a failure to warn claim. An adequate sight distance is one means of providing motorists with warning that a train is approaching. Here, as with the negligent maintenance of crossing devices allegation, Zimmerman cannot maintain his inadequate sight distance claim because the train that Zimmerman struck *198 occupied the crossing, triggering application of the Occupied Crossing Rule.
This issue is not controlled by controverted facts but by fundamental precepts of negligence, under which a plaintiff must first establish that a defendant does in fact have a duty. Here, application of the Occupied Crossing Rule would compel us to hold that summary judgment was appropriate because the railroad had no duty to warn of the presence of the train that occupied the crossing at Diller Avenue. Nevertheless, to address the specific points made by the majority, I now turn to the common-law duties to maintain a safe crossing and provide adequate sight distances.
V.
I would hold that the District Court properly granted summary judgment in favor of Norfolk Southern because, even assuming that the railroad owed duties to Zimmerman under the circumstances of the accident, no genuine issue of material fact exists as to those duties.
The District Court noted “that the Third Circuit in Strozyk held that § 646.214(b) only preempts claims regarding the adequacy of warning devices, and does not preempt the common-law duty to maintain a safe grade crossing.” App. 00032. The Court explained that “railroads continue to have the common-law duty ‘to provide a reasonably safe grade crossing,’ ‘such as the duty to keep visibility at grade crossings free from obstructions.’ ” Id. (quoting Strozyk, 358 F.3d at 276-277). I, along with the majority, agree with the District Court’s conclusion that this claim was not preempted. Although the claim was not preempted, the District Court nevertheless granted Norfolk Southern’s motion for summary judgment because Zimmerman had not made a prima facie claim for negligence. The Court determined that Zimmerman failed to establish that Norfolk Southern: (1) had a duty to remove a privately owned building, located off of the railroad’s right-of-way, that potentially obscured sight lines; and (2) negligently failed to maintain a reasonably safe crossing. Accordingly, the District Court held that there was no genuine issue of material fact and that summary judgment was appropriate. Whereas the majority states that “[tjhere is sufficient evidence of each element to allow the claim to go forward,” Majority Opinion 191, I disagree and would hold that the District Court correctly granted summary judgment.
VI.
In determining whether summary judgment was appropriate here, I must therefore determine whether any genuine issue of material fact exists as to Norfolk Southern’s common-law duties of care.
To establish a prima facie case for negligence under the common-law theory that Norfolk Southern faded to maintain a reasonably safe crossing by negligently maintaining the crossing devices and failing to provide adequate sight distance, Zimmerman had to adduce facts that demonstrate: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the breach and the resulting injury; and (4) actual loss suffered by him. See Rooney v. City of Phila., 623 F.Supp.2d 644, 660 (E.D.Pa.2009).
A.
Zimmerman asserts that Norfolk Southern allowed the warnings at the Diller Avenue crossing to fall into disrepair, breaching its duty to maintain warning devices at the crossing. According to the majority, the record supports his allegations that the warning sign was covered by *199 tree branches, that pavement markings no longer existed, and that the crossbucks had been permitted to fall into disrepair. Majority Opinion 190. With regard to the tree branches, Zimmerman has failed to put forth competent evidence demonstrating that the foliage blocked his view of the advance warning sign on the day of the accident. Curiously, the majority points to photographs taken in 2011 to support the proposition that tree branches blocked the view of the warning sign in 2008 at the time of the accident. The only competent evidence of the condition of the foliage near the time of the accident is set forth at pages 00503-00519 of the Appendix. From these photographs, taken the day after the accident, it appears that the foliage did not block the advanced warning sign. See App. 00515 (picture taken 191 feet north of the crossing). Even if we were to use the photographs taken in 2011, the advanced warning sign does not appear to be obscured by foliage from at least as far as 300 feet north of the crossing.
The majority refers to tree branches covering the crossbucks, but Zimmerman’s assertion regarding the crossbucks is that they were in “disrepair,” not that they too were covered by foliage. As to this assertion, he likewise has offered no competent evidence that the crossbucks were in disrepair at the time of the accident. Finally, although the majority has determined that “[pjhotographs suggest there once was a white line north of the crossing, but that the line had faded” by the time of the accident, Majority Opinion 189, I conclude that there is no competent evidence to support this proposition. I agree that there does not appear to have been a painted line north of the crossing in 2008, judging from the photographs taken one day after the accident. Interpreting facts in the light most favorable to Zimmerman, however, does not require us to decide that evidence of fresh paint in 2011 means that the lines existed at some point prior to the accident, but later faded such that they needed repainting.
The majority rejects Norfolk Southern’s causation argument, but here it has misconstrued Zimmerman’s own testimony regarding the impact of his many crossings at the Diller Avenue crossing. According to the majority, “in his deposition, Zimmerman said that he had crossed the track many times before the accident and that he believed the crossing was inactive.” Majority Opinion 190 (citing App. 00235). The majority states also that from Zimmerman’s testimony, combined with evidence of poor maintenance of the crossing, “it is reasonable to infer that state of disrepair at least contributed to his belief that the crossing was inactive.” Id. at 190. However, a closer reading of the cited portions of Zimmerman’s deposition testimony is instructive. Zimmerman stated, “[I] did not know that that track had a regular train on it. I have never seen a train on that track, and so I don’t know what — when I would have actually looked to see if a train was coming. I certainly wasn’t expecting — to my knowledge, it was an unused track.” App. 00235. Later, he stated “I mean, like I said, I never expected to see a train there.” App. 00236. Zimmerman now wishes to recharacterize his reason for believing that the crossing was inactive to be the result of Norfolk Southern’s failure to maintain warning devices. His deposition testimony makes it clear, however, that he believed the crossing was inactive because he had never seen a train on that track, over his years in the area and hundreds of trips down Diller Avenue.
Accordingly, I would hold that the District Court correctly granted summary judgment on the negligent failure to maintain crossing devices portion of Zimmer *200 man’s failure to maintain a safe crossing claim.
B.
Next, Zimmerman contends that Norfolk Southern negligently failed to maintain a safe crossing when it failed to remove an obstruction, even though the obstruction was not located on the railroad’s right-of-way. Indeed, Norfolk Southern neither possessed nor controlled any land beyond its narrow right-of-way in the area of the Diller Avenue crossing. Although he relies on Fallon v. Penn Cent. Transp. Co., 444 Pa. 148, 279 A.2d 164 (1971), to support his contention that Norfolk Southern had a duty to remove the building, the teachings of Fallon do not support this position. That case states that railroads have a special duty of care towards those who use a crossing with a “dangerously limited view,” and that duty is to “regulate the running of its trains as to make it possible for a driver to cross the tracks in safety if, when just before entering upon them, he stopped, looked and listened, and no train was within sight or sound.” Id. at 167 (emphasis added) (internal quotation marks and citations omitted). The majority, paraphrasing Fallon, states broadly that under Pennsylvania law, “railroads have a duty to ensure that motorists are able to see approaching trains.” Majority Opinion 190. As is clear from the emphasized language above, this is an incomplete statement of the law.
The stop, look and listen rule, like the Occupied Crossing Rule, has a long history in Pennsylvania. In Briach v. Pa. R.R. Co., 462 F.2d 266 (3d Cir.1972), this Court traced the origins of the stop, look and listen rule, noting that “[development of the so-called ‘stop, look and listen’ doctrine originated over a century ago,” in the case of Reeves v. Del., Lackawanna & W. R.R. Co., 30 Pa. 454 (Pa.1858), where “the court determined that a traveler on a public highway ‘is bound to stop and look out for trains.’ ” Briach, 462 F.2d at 268. Later cases held that failure to stop and look constituted negligence per se, and the requirement to listen was added to the rule in 1867. Id. at 268-269. By 1873, the Pennsylvania Supreme Court “stated that the duty to ‘stop, look and listen’ was an ‘unbending’ rule of law and failure to comply with any one of the three absolutes constituted negligence as a matter of law.” Id. at 269 (quoting Pa. R.R. Co. v. Beale, 73 Pa. 504 (1873)). By 1972, this Court noted that recent case law from the Pennsylvania Supreme Court affirmed and utilized the stop, look and listen rule. Id.
All of these cases, as well as Briach, pre-dated the Legislature’s adoption of the Comparative Negligence Act. However, like the Occupied Crossing Rule, “the common law ‘stop, look, and listen’ rule has survived the Legislature’s abolishment of contributory negligence.” Krentz, 910 A.2d at 29. Although under the Comparative Negligence Act a plaintiffs failure to stop, look and listen no longer constitutes an absolute bar to recovery in all railroad-crossing cases, here the long-standing obligation is embedded within the railroad’s duty to provide an adequate sight distance. The special duty under Fallon, which is triggered when a dangerously limited view exists, requires a railroad to make it possible for a driver to safely cross the tracks if that driver stops, looks and listens, and no train is within sight or sound.
At a crossing with a dangerously limited view, a railroad is only required to regulate the running of its trains to make safe crossing possible for drivers who stop, look and listen. This is not to say that Zimmerman cannot recover because he did not *201 stop, look and listen; I would hold that where a plaintiff cannot show that a railroad violated its duty under Fallon — that is, the duty to run its trains in a manner that makes it safe for a driver to cross tracks after stopping, looking and listening for trains — summary judgment is appropriate. Based on the record, Zimmerman presented no evidence to establish that Norfolk Southern violated its special duty under Fallon.
The record before us shows that the lead engine’s headlight was on “full” and the horn had been blowing for one-quarter of a mile, or 45 seconds, such that two people traveling 60 feet behind Zimmerman could hear the horn as the train approached the Diller Avenue crossing. Zimmerman does not, and cannot, maintain that he stopped, looked and listened prior to crossing the tracks or that, even if he had, he would have nonetheless been harmed. He has represented that he has no present recollection of the events concerning his approach to the crossing and the collision. Not a whit of evidence was provided that he complied with the venerable stop, look and listen precepts of Pennsylvania law. Moreover, no contention is presented by brief or oral argument that he did so.
It must be noted that the requirement to stop, look and listen is not abrogated merely because the motorist’s view is obstructed at one point but not another. See Benner v. Phila. & R. Ry. Co., 262 Pa. 307, 105 A. 283, 285 (Pa.1918) (“It is further argued that [plaintiff] was relieved from the obligation to stop because of the obstructions which prevented his view before crossing ... but, if this be true, another duty was imposed upon him. It was his duty to alight and go to a point where he could make a proper observation.”). Zimmerman admitted that he could have seen the approaching train when he was “within less than forty feet of the crossing.” App. 00073. But, when he came to that point where he could have seen the train, he did not “stop, look and listen,” as required by Pennsylvania law. He now asks us to hold the railroad at fault for his own failure to follow the law. I would not do so. Zimmerman offered no evidence that he had obeyed a fundamental maxim of the law formidably designed to prevent him from crashing into the side of a passing train. Accordingly, no genuine issue of material fact exists as to whether Norfolk Southern met its duty of care.
C.
I conclude therefore that no genuine issue of material fact exists regarding Norfolk Southern’s maintenance of the Diller Avenue crossing.
Notwithstanding my conclusion that Zimmerman failed to establish a prima facie claim of negligence under state law, he asserts that a claim was nevertheless made, and thus a genuine issue of material fact exists, based on the railroad’s violation of its internal policy to contact landowners with obstructions located off of the railroad’s right-of-way, which was “created pursuant to [federal] regulation.” See 49 U.S.C. § 20106(b)(1)(B). This argument is unpersuasive. He contends that the railroad’s policy regarding sight obstructions was issued pursuant to 49 C.F.R. §§ 217.7, 217.11, and 218.1. These regulations, however, do not require railroads to create specific policies but merely require a railroad to keep copies of its operating rules and timetables, see § 217.7, and to keep records of its program of instruction to help employees learn the railroad’s operating rules, see § 217.11. Section 218.1 merely states that the regulations provide minimum requirements and that railroads are free to prescribe more stringent rules. He has failed to identify any regulation requir *202 ing Norfolk Southern to adopt the alleged policy at issue.
Furthermore, nothing in 49 U.S.C. § 20106 creates a private right of action for a railroad’s failure to comply with any internal policy which it created and which was not otherwise created pursuant to a federal regulation. Zimmerman’s broad interpretation of § 20106, such that Norfolk Southern’s internal policy was “created pursuant to a regulation,” is not supported by the statute’s text. As the District Court properly noted, “[s]uch an interpretation would discourage railroads from otherwise implementing internal policies in order to avoid additional self-imposed duties of care.” App. 00033.
I conclude, therefore, that although the common-law duty to maintain a safe crossing area — including the duties to maintain crossing devices and to provide adequate sight distance — is not preempted by federal law, the District Court nevertheless properly granted summary judgment as to this claim because Zimmerman failed to establish a prima facie claim that the railroad breached its duty.
VII.
The majority elects not to confront the critical Pennsylvania stop, look and listen rule, stating:
The District Court explicitly refrained from deciding whether Zimmerman was negligent. Zimmerman, 2011 WL 3625039 at *21 n. 34 (“I do not need to consider defendant’s additional arguments that plaintiff was comparatively negligent by failing to comply with Pennsylvania law.”). And neither side has addressed the question of Zimmerman’s negligence on appeal. We therefore refuse to affirm on these grounds.
Majority Opinion 191 n. 16.
The majority’s position requires special attention. First, “stop, look and listen” is language that appears in more than one place and for more than one reason: it is used not only to impose a duty on motorists, see 75 Pa.C.S.A. § 3341(a), but also to limit the duty owed by railroads, see Fallon v. Penn Cent. Transp. Co., 444 Pa. 148, 279 A.2d 164 (1971). I do not affirm the District Court’s judgment on the ground that Zimmerman was negligent, but on the ground that even if we accept as true all Zimmerman has alleged in connection to his inadequate-sight-distance claim, he cannot establish that the railroad breached its limited common law duty to “regulate the running of its trains as to make it possible for a driver to cross the tracks in safety if, when just before entering upon them, he stopped, looked and listened, and no train was within sight or sound.” Id. at 167 (emphasis added) (internal quotation marks and citations omitted).
Second, I wish to make clear that my colleagues did not suggest that I lacked jurisdiction to discuss the implications of the stop, look and listen rule. Instead, they choose to “refuse to affirm on these grounds.” Had the majority challenged this Court’s jurisdiction to consider this, they would have gotten nowhere, for an appellate court is authorized to affirm a district court’s judgment for reasons other than those stated by the trial court, as long as the record supports the judgment. See Guthrie v. Lady Jane Collieries, Inc., 722 F.2d 1141, 1145 n. 1 (3d Cir.1983) (citing Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937)). Similarly, an appellate court is not shackled to the briefs or oral argument of counsel. An appellate court is not stripped of jurisdiction to discuss an important — if not the most important — relevant precept of law where, as here, a motorist operates his vehicle into the side of a railroad train proceeding though a street crossing mere *203 ly because (1) a district court refuses to discuss it even though raised by the defendant, and (2) the appellate lawyers decide not to discuss it by brief or oral argument. The issue was raised in the District Court. That vests in me the authority to consider it on appeal.
In electing to refuse to consider the impact of Zimmerman’s failure to “stop, look and listen” as a grounds that may warrant affirming the District Court, the majority reflects a theory of jurisprudence that has been rejected in America for almost 100 years. This jurisprudence of concepts was known by the Germans as Begriffsjurisprudenz, and was the theory behind the 17th Century movement to codify the law in much of Europe. Later, the prominent German jurisprudent Rudolf von Ihering insisted that the first question should be how will a rule or a decision operate in practice and advocated a jurisprudence of results. For example, if a rule of commercial law were in question, the search should be for the rule that best accords with and gives effect to sound business practice. Rudolf von Ihering titled this jurisprudence Wirklichkeitsjurisprudenz. Roscoe Pound, Mechanical Jurisprudence, 8 Colum. L.Rev. 605, 608, 610 (1908). See also Rudolf von Ihering, Der Geist des romischen Rechts (1907). Whatever had been possible procedural restrictions on appeal at one time in the Civil Law countries of European Nations utilizing the jurisprudence of concepts, at least until the end of the 19th century, as I will demonstrate below, we should not adhere to this now disfavored approach.
In the beginning of the 20th century the great masters of American Jurisprudence — Oliver W. Holmes, Jr., Benjamin N. Cardozo and Professor Roscoe Pound— rejected the jurisprudence of concepts for what they called a jurisprudence of results. Because this discussion has not often appeared in many judicial opinions, if any at all, I will summarize how the great change came about, a change in the nature of jurisprudence doctrine that our courts have now followed for almost 100 years, a change that was advocated by these great American masters.
In his classic The Nature of the Judicial Process, Cardozo explained hornbook doctrine that sometimes the source of the law to be embodied in a judgment is obvious, as when the Constitution or a statute applies. Benjamin N. Cardozo, The Nature of the Judicial Process 14 (1921). In these situations, the judge simply obeys the constitutional or statutory rule. But when no constitutional or statutory mandate controls, the judge must compare that case with the precedents, “whether stored in his mind or hidden in the books.” Id. at 19. If the comparison yields a perfect fit, if both the law and its application are clear, the task is simple. If the law is unclear, it is necessary to “extract from the precedents the underlying principle” and then “determine the path or direction along which the principle is to move and develop, if it is not to wither and die.” Id. at 28. Cardozo cautioned that decisions “do not unfold their principles for the asking. They yield up their kernel slowly and painfully.” Id. at 29. He discussed what he called the “organons” of the judicial process — the instruments by which we fix the bounds and tendencies of that principle’s development and growth. He also discussed the use of history and customs, and then promulgated what in 1921 was considered a revolutionary technique of decision-making — the method of sociology, a jurisprudence that concentrated on results.
By describing the elements at work in the caldron, Cardozo was performing the valued task of a traditional common law judicial analyst. That he ranks with Oliver *204 Wendell Holmes, Jr. as one of our greatest common law judges is scarcely now debatable. But to the extent that he developed, persuasively and gracefully, a legitimation for result-oriented jurisprudence, he became more a legal philosopher than a common law judge. He sought what ought to be the law, in contrast with what is.
Although Cardozo is not generally listed as a member of the enthusiastic corps of American Realists, he must be ranked with Holmes, as an elder statesman of that exciting cadre of reformers. In the last quarter of the 20th century critics were quick to recognize the legitimacy of decisions based on social welfare, but in 1921 Cardozo’s arguments brought respectability to what theretofore had been condemned as blatant result-oriented jurisprudence. He was neither timid nor uncertain in espousing his self-styled method of sociology. To him it was “the power of social justice,” and among all principles of the decision-making process, it was “the force which in our day and generation is becoming the greatest.” Id. at 65-66. To him the preferred gap-filler in addressing novel questions of law was the social welfare, defined “as public policy, the good of the collective body,” or “the social gain that is wrought by adherence to the standards of right conduct, which find expression in the mores of the community.” Id. at 71-72.
Accustomed as we are today to lavish reliance by prestigious courts on judicial concepts of public policy, Cardozo’s statements in the early 1920s must be placed in the context of judicial process of that era. Judges then were disciples of what Rudolph von Ihering styled as a jurisprudence of concepts, and as early as 1897 American courts were being chided for undue reliance on concepts.
In The Path of the Law, Oliver Wendell Holmes gently admonished:
I think that the judges themselves have failed adequately to recognize their duty of weighing considerations of social advantage. The duty is inevitable, and the result of the often proclaimed judicial aversion to deal with such considerations is simply to leave the very ground and foundation of judgments inarticulate, and often unconscious....
O.W. Holmes, The Path of the Law, 10 Harv. L.Rev. 457, 467 (1897).
Within a decade Roscoe Pound was trumpeting the same theme: “The most important and most constant cause of dissatisfaction with all law at all times is to be found in the necessarily mechanical operation of legal rules.” Roscoe Pound, The Causes of Popular Dissatisfaction with the Administration of Justice, 40 Am. L.Rev. 729 (1906), reprinted in 8 Baylor L.Rev. 1 (1956).
Critics labeled this blind adherence to precedents, or to the rules and principles derived from them, “mechanical jurisprudence” and “slot machine justice.” Pound called for a new look at what he described as “pragmatism as a philosophy of law,” and stated vigorously: “The nadir of mechanical jurisprudence is reached when conceptions are used, not as premises from which to reason, but as ultimate solutions. So used, they cease to be conceptions and become empty words.” Roscoe Pound, Mechanical Jurisprudence, 8 Colum. L.Rev. 605, 608, 610 (1908).
Yet founders of the Results Jurisprudence — Holmes, Pound and Cardozo — had early historical support for their advocacy. Professor Calvin Woodard of the University of Virginia suggests that their theory draws on Jeremy Bentham’s utilitarian thesis:
[T]he advocates of Sociological Jurisprudence seized upon this aspect of Bentham’s message. Like him, they insisted *205 that law has a practical, real world moral purpose, though they defined that purpose more in terms of social justice, and the balancing of social interests, than [Bentham’s] “the greatest happiness of the greatest number.”
Calvin Woodard, Thoughts on the Interplay Between Morality and Law in Modem Legal Thought, 64 Notre Dame L.Rev. 784, 795 (1989).
Typical of judicial utterances that had disturbed Holmes, Pound, and Cardozo was one by the Maryland Court of Appeals in 1895: “Obviously a principle, if sound, ought to be applied wherever it logically leads, without reference to ulterior results.” Gluck v. Baltimore, 81 Md. 315, 32 A. 515, 517 (1895). In contrast, the same year that Cardozo delivered the Storrs Lecture at Yale, he seized the opportunity to put his new theory into practice by publicly rejecting blind conceptual jurisprudence in Hynes v. New York Central Railroad Co., 231 N.Y. 229, 131 N.E. 898 (1921). A sixteen-year-old boy had been injured while using a crude springboard to dive into the Harlem River. The trial court had ruled that if the youth had climbed on the springboard from the river before beginning his dive, the defendant landowner would have been held to the test of ordinary care, but because the boy had mounted from land owned by the defendant railroad company, the court held the defendant to the lower standard of care owed to a trespasser. Cardozo rejected this analysis, describing it as an “extension of a maxim or a definition with relentless disregard of consequences to £a dryly logical extreme.’ The approximate and relative became the definite and absolute.” Id. at 900.
Cardozo’s opinion in Hynes is a prototype, and his The Nature of the Judicial Process an apologia, for decision-making based on result-oriented judicial concepts of public policy. The philosophical underpinnings of what Cardozo described as the sociological or results method run counter to the widely held notion that the public policy should be formulated and promulgated only by the legislative branch of government. When judges rather than the legislators declare public policy, their declarations produce local and national tensions. When judges utilize this method, laymen and some lawyers label them as “activists,” “liberals,” “loose constructionists,” and a host of other epithets, gentle and otherwise.
But modern American jurisprudence is more than the results method, although its influence is strongly felt. The legal realists of the 1930s and 40s worried about what they called “the social performance of law.” Those same concerns are said to lie close to the heart of the Critical Studies Movement as well. To be sure, the Law and Economics school can be said to be result-oriented, but it stresses “economic efficiency” rather than social justice.
Modern American jurisprudence constantly seeks the answers to the serious questions presented by the theories of adjudication, theories both old and new. We must keep in mind the central question put to us by the thoughtful Professor Woodard:
What better measure is there of the value of a legal system, or indeed of the rule of law itself, than the quality of life of those subject to it? And if this approach stresses the morality of results, it also puts a huge moral burden on the hand that wields the tool of law.
Woodard, supra, at 796.
From the foregoing, in this railroad crossing case, stop, look and listen may not be cast aside as in the former era of a jurisprudence of concepts (we won’t meet it on appeal because the trial judge did not meet it). In modern concepts of jurispru *206 dence to ignore this is to run in the face of Holmes’s words, “I think that the judges themselves have failed adequately to recognize their duty of weighing considerations of social advantage. The duty is inevitable, ...” And also the words of Pound: “The most important and most constant cause of dissatisfaction with all law at all times is to be found in the necessarily mechanical operation of legal rules.” And finally the words of Cardozo in New York Central Railroad: you should not extend “a maxim or a definition with relentless disregard of consequences to ‘a dryly logical extreme.’ ”
By 1974 Harry W. Jones, Cardozo Professor of Law at Columbia Law School, would teach us:
Law is not a form of art for art’s sake; its ends-in-view are social, nothing more and nothing less than the establishment and maintenance of a social environment in which the quality of human life can be spirited, improving and unimpaired.
Harry W. Jones, An Invitation to Jurisprudence, 74 Colum. L.Rev. 1023, 1025 (1974)
The Pennsylvania stop, look and listen rule was an omnipresent brooding presence in this case. I will not put my head in the sand and ignore it.
VIII.
The next issue is whether the District Court properly granted Norfolk Southern’s motion for summary judgment on Zimmerman’s excessive-speed claim. I agree with the majority opinion insofar as it holds that excessive-speed claims are preempted when a train is traveling below a federally mandated speed limit. Majority Opinion 180. I also agree with the majority that 49 C.F.R. § 213.9 creates federally mandated speed limits by establishing “the degree of care that railroads must exercise on each class of tracks: trains should not exceed ten miles per hour on Class 1 tracks, twenty-five miles per hour on Class 2 tracks, and so on.” Majority Opinion 180.
I disagree, however, with the majority’s holding that Zimmerman’s excessive-speed claim is not preempted by § 213.9 because he has raised a triable issue of fact as to whether the track at the Diller Avenue crossing was a Class 1 track- — -the only class of track for which the train’s speed would have exceeded the federally mandated limit under § 213.9, and the only class of track for which Zimmerman’s claim would therefore not be preempted by § 213.9. I would hold that Zimmerman failed to provide any competent evidence that the tracks were classified as Class 1 because, as the District Court held, the limited evidence Zimmerman sought to introduce for this purpose was privileged under either 23 U.S.C. § 409 or 49 U.S.C. § 20903. Zimmerman is left without any competent evidence to rebut Norfolk Southern’s testimony that the track was either Class 2 or Class 3, which both have maximum speed limits greater than the speed the train was traveling, and therefore Zimmerman’s excessive-speed claim is preempted by § 213.9 and summary judgment was proper.
A.
Zimmerman sought to introduce two groups of documents to challenge Norfolk Southern’s testimony that the track at issue was a Class 2 or Class 3 track: inventory documents from the Department of Transportation’s National Crossing Inventory and accident reports dating back to 1975. I would hold that the inventory documents were privileged under 23 U.S.C. § 409 and that the accident reports were privileged under 49 U.S.C. § 20903.
B.
The first group of documents Zimmerman sought to introduce were nine doc *207 uments titled “U.S. DOT-Crossing Inventory Information.” Eight of these documents state a maximum permissible speed of 10 miles per hour for trains crossing Diller Avenue, and one states a maximum permissible speed of 15 miles per hour. If admitted into evidence, these documents would create a genuine issue of material fact as to whether the operation of the train was negligent per se, given that it was traveling at a speed of 24 miles per hour at the time of the collision. Furthermore, they would establish the possibility that Zimmerman’s excessive-speed claim is not preempted by § 213.9 because they would demonstrate that Norfolk Southern may have exceeded the federally mandated speed limit set for the Diller Avenue crossing.
To determine whether the Inventory documents are admissible, both the majority and I must analyze carefully 23 U.S.C. § 409, which states:
[Rjeports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of ... railway-highway crossings, pursuant to sections 130, 144, and 148 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.
(emphasis added).
The Supreme Court teaches that § 409 was enacted to facilitate programs including the Crossings Program promulgated by 23 U.S.C. § 130. See Pierce Cnty. v. Guillen, 537 U.S. 129, 133-134, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003). The Crossings Program was enacted to assist states in identifying highways and railways in need of improvements. It makes funds available to states for the “cost of construction of projects for the elimination of hazards of railway-highway crossings.” § 130(a). To participate, states must “conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose.” § 130(d). Because participation in these programs required states to disclose safety-related information that could expose them to civil liability, such as information related to accident sites, Congress adopted § 409 to encourage disclosure. See Guillen, 537 U.S. at 133-134, 123 S.Ct. 720.
Additionally, in Guillen, the Supreme Court concluded that § 409 protected all data collected by an agency in support of the Federal Hazard Elimination Program (“§ 152”), regardless of the source of the information. See id. at 145-146, 123 S.Ct. 720. At the time, § 152 appeared within the text of § 409 as a program falling within the statute’s coverage, just as § 130 appeared and still appears to this day within the text of § 409. For this reason, I would hold that the teachings of Guillen apply equally to § 130 programs and would hold that § 409 protects all data collected by an agency in support of § 130, regardless of the source of information. Because I conclude that the inventory documents sought to be introduced here fall within § 409, they are inadmissible and I would affirm the District Court’s holding.
C.
Because § 409 does not protect information that was compiled, collected, obtained *208 and utilized for purposes unrelated to one of the three programs identified in the statute, see Guillen, 537 U.S. at 146, 123 S.Ct. 720, the relevant inquiry here, in determining whether § 409 applies, is whether the information in the inventory documents was collected, generated or compiled for the purpose of pursuing the objectives of the federal program promulgated by § 130.
I agree with the District Court that the inventory documents were “surveys,” which were “compiled and collected” “for the purposes of ... planning the safety enhancement of railway-highway crossings,” and done pursuant to § 130, which requires states to “conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require [improvements].... ” See App. 00047.
The inventory documents at issue were compiled and collected for the U.S. DOT National Highway-Rail Crossing Inventory Program, which began in the 1970s after the passage of The Federal-Aid Highway Act. “The purpose of the U.S. DOT National Highway-Rail Crossing Inventory Program is to provide for the existence of a national inventory database that can be ... used ... for planning and implementation of crossing improvement programs.... ” Federal Railroad Administration, U.S. DOT National Highway-Rail Crossing Inventory: Policy, Procedures and Instructions for States and Railroads 3 (2007), http://www.fra.dot.gov/downloads/ safety/RXIPolicyInstructions0807.pdf [hereinafter “2007 Manual”]. Moreover, the current Program Manual instructs railroads to send their completed inventory documents to the appropriate “State Inventory Contact” so that the last portion of the form may be completed by the state. 2007 Manual 6. The state’s participation in the Inventory Program, and its use of the same forms used by the railroads, provides further support that the inventory documents are privileged under § 409.
Congress clearly and emphatically intended by enacting § 409 to prohibit this type of federally required record keeping from being used as a “tool in litigation.” See Guillen, 537 U.S. at 146, 123 S.Ct. 720 (explaining that Congress amended § 409 to include “or collected” in order “to make clear that § 152 [a section formerly included in the text of § 409 as § 130 is now included] was not intended to be an effort-free tool in litigation against state and local governments.”). Additionally, because the inventory documents at issue were “compiled and collected” for the U.S. DOT National Highway-Rail Crossing Inventory Program, the purpose of which is “to provide for the existence of a national inventory database that can be ... used ... for planning and implementing] ... crossing improvement programs,” I would hold the documents were collected, generated or compiled for the purposes of § 130 and would affirm.
D.
In addition to the inventory documents, Zimmerman attempted to introduce ten accident reports involving the Diller Avenue crossing, five of which involve accidents from the 1970s and state the track is a Class 1 track. I would hold that The District Court correctly determined that these accident reports were privileged pursuant to 49 U.S.C. § 20903, which states in part:
No part of an accident or incident report filed by a railroad carrier under section 20901 of [Title 49] ... may be used in a civil action for damages resulting from a matter mentioned in the report.
A railroad, pursuant to 49 U.S.C. § 20901(a), is required to file a monthly report with the Secretary of Transporta *209 tion “on all accidents and incidents resulting in injury or death to an individual,” and the parties do not dispute that the reports at issue here were filed pursuant to § 20901.
The majority opinion limits this privilege to encompass only the report filed in direct response to Zimmerman’s accident while leaving open the possibility that all other reports — whether filed before or after Zimmerman’s accident — -may be used in his lawsuit against Norfolk Southern. Such a holding defeats the general purpose of privileges such as § 20903, which promote public safety by encouraging candor. I would hold, therefore, that all the accident reports Zimmerman seeks to introduce fall within the § 20903 privilege.
E.
Without the inventory documents and accident reports, there is no evidence that the tracks at Diller Avenue were classified as Class 1, with a maximum permissible speed of 10 miles per hour. And, because it is undisputed that the train was traveling at 24 miles per hour — which is permissible on both Class 2 and Class 3 tracks— no genuine issue of material fact exists as to whether the train exceeded the speed permissible under § 213.9. Therefore, Zimmerman’s claim of excessive speed is preempted and summary judgment was proper.
‡ % % sjí s{i
I would conclude that the District Court properly held that Zimmerman’s claims of negligence based on (1) inadequate signals and (2) excessive speed are preempted. I would conclude also that the District Court did not err in granting summary judgment in favor of Norfolk Southern for Zimmerman’s claims that the railroad failed to (3) maintain a reasonably safe crossing and (4) provide adequate sight distance, because Zimmerman failed to establish a prima facie negligence claim, and therefore no genuine issue of material fact exists.
Finally, I would hold that the District Court properly concluded that Zimmerman’s excessive-speed claim is preempted by § 213.9 because Zimmerman cannot establish that there is a material issue of fact as to whether the train’s speed exceeded the federal limit permitted at the Diller Avenue crossing without the inventory documents and accident reports, which I would hold are privileged. Summary judgment was therefore appropriate and I would affirm the District Court’s judgment in all respects.

. A crossbuck is an X-shaped sign that reads: “Railroad Crossing,” and “requires road users to yield the right-of-way to rail traffic at a highway-rail grade crossing.” U.S. Dept. of Transp. Fed. Highway Admin., Manual on Uniform Traffic Control Devices, 542 (2009).

. Because Zimmerman was unable to testify about the relevant aspects of the event, I reject the majority opinion’s reference to his alleged observations before his collision with the side of the train. The majority opinion states that "[w]hen he was less than seventy-six feet away, he noticed that a train was approaching. He tried to stop, but his front brake locked and he flew over the handlebars, colliding headfirst with a locomotive.” Majority Opinion 174. In Zimmerman’s deposition, he stated that he did not recall seeing the train on the night of the accident. App. 00236-00237.

. The majority's footnote 13 states that the Occupied Crossing Rule does not apply because “[h]ere, the train rushed into view at the last second,” and "the train was not visible in time for Zimmerman to avoid the accident[.]” The train did indeed arrive at the crossing shortly before Zimmerman struck it, but it fully occupied the crossing at the moment of impact. As the majority states, railroads still have a duty to warn of approaching trains; here, the record before us shows that the lead engine’s headlight was on "full” and the horn had been blowing for one-quarter mile, or 45 seconds, such that two people traveling 60 feet behind Zimmerman could hear the horn as the train approached the Diller Avenue crossing.